THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DAVID R. WILSON, Defendant-Appellant.

Third District No. 3—84—0403

Opinion filed May 3, 1985.

Robert Agostinelli and Thomas A. Lilien, both of State Appellate Defender's Office, of Ottawa, for appellant.

John A. Barra, State's Attorney, of Peoria (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCOTT delivered the opinion of the court:

The defendant, David R. Wilson, appeals following a jury trial in Peoria County which found the defendant and his brother, William L. Wilson, guilty of murder, felony murder and armed robbery. The jury further determined that the death penalty should not be imposed on either defendant. The trial court sentenced the defendant to natural life imprisonment for the felony murder conviction and a consecutive sentence of 60 years' imprisonment for armed robbery. The State has since conceded that the defendant's conviction and sentence for armed robbery must be vacated as being a lesser included offense of felony murder. *People v. Abrams* (1982), 109 Ill. App. 3d 901, 441 N.E.2d 352; *People v. Devine* (1981), 98 Ill. App. 3d 914, 424 N.E.2d 823.

The defendant presents the following issues for review: (1) whether the trial court properly denied the defendant's motion to suppress statements made and evidence seized following his arrest without a warrant which allegedly lacked probable cause; (2) whether the trial court abused its discretion in sentencing the defendant to natural life imprisonment.

At the hearing on defendant's motion to suppress, the evidence indicated that during the late afternoon of October 31, 1983, Marion Wood was found dead of multiple stab wounds at the Bi-Sel Novelty

Store in Peoria. There were footprints from a tennis shoe in the blood. A man who lived in the building in which the shop was located found the victim's body about 4 p.m. The police arrived at the scene around 4:30 and found that the body was still warm.

One of the investigating officers, Detective Dale Whitledge, testified that he talked with Herman Capshaw, a private citizen, at the police station on November 1, 1983. Capshaw indicated that he had arrived at the novelty store between 2:30 and 3 p.m. on October 31 and left about 3:30 or 4 p.m. At one point while Capshaw was in the store, Wood waited on two men who were looking at television sets. The men described by Capshaw matched the physical characteristics of the defendant and his brother. The two men bargained with Wood over a television set but left the store without making a purchase, but they told Wood that they would return before closing time, which Wood told them was 4:30 p.m. After the two men left, Wood told Capshaw that it was a shame someone so young, referring to one of the men, had been in prison.

The police learned from a Mr. Burns that Wood was alive and behind the counter in the store just before 4 p.m. on the afternoon he was murdered.

Additional investigation led Whitledge to talk with Evelyn Wood, the mother of the defendants, at the Pour House Tavern, which was approximately 50 feet from the novelty store. Mrs. Wood told the police on November 1 that she had just spoken with Cheryl Wilson, William's wife, that morning and that apparently William had come home the night before with blood all over his clothes and a severe cut on his index finger. According to Evelyn, William told his wife that he was injured fighting some black men who had raped a white girl on Main Street in Peoria. There was no record that either the defendant or his brother had reported the incident to the police, nor did the rape complaint mention the intercession of the defendant or his brother. The police had no suspect in the rape at the time. Mrs. Wood told the police that her sons had been in trouble before. Mrs. Wood further indicated that at one time she had been married to the decedent's nephew and that the defendants knew the decedent.

The bartender at the tavern told Whitledge that the defendant and his brother had been in the bar on the day of the murder from approximately 11 a.m. to 3 p.m. and that they had been drinking beer.

When Whitledge left the tavern on November 1, he was approached by Richard Curtis, an employee of a Firestone store in the area, and was told that Curtis had seen two men matching the defendants' descriptions walking side-by-side down an alley on the

afternoon of the murder between 3 and 3:30 p.m. One of the men had a wallet with a chain and a knife in a sheath. Mrs. Wood had just told Whitledge that the older brother, the defendant, carried a chain-type wallet with a knife in a sheath.

When Whitledge returned to the police station, he reported the results of his investigation to his supervisor, who told him that the defendant's fingerprints had been matched with a fingerprint found at the scene of the murder. In addition, the owner of the shop later told the police that a knife was missing from the glass display case which the police found to have been left open 3 to 4 inches on the afternoon of the murder.

The officers believed that more than one assailant was involved in the murder, since not only had several people seen the victim and the men in the shop and the immediate area on the afternoon of the murder, but the victim had a large number of wounds both to the front and back of his body.

Before arresting the defendant and his brother, the police secured their mug shots from prior arrests which matched the descriptions given them by their mother and various witnesses at or near the scene of the crime.

■ In addition to the foregoing prearrest information obtained by the police in their investigation, it was apparent that exigent circumstances required that the police act quickly to apprehend the persons who had murdered the decedent. The evidence obtained at the scene of the crime indicated that the attack had been a vicious assault, with multiple stab and slash wounds on the victim's body, face and head. The victim's throat had been slashed and he had been stabbed in the eyes. Certainly the police could reasonably have concluded that the assailants were armed and dangerous. While it may have been preferable, in hindsight, once they discovered that the defendant's fingerprint had been found on the glass display case at the scene of the crime, to pause and conduct a photographic lineup with Mr. Capshaw and the other witnesses in the area before arresting the defendant and his brother, it is no less clear that the trial court properly determined that at least probable cause existed for the defendant and his brother's arrest.

■ It must be remembered that it is not necessary that the information available to the police prove a defendant's guilt beyond a reasonable doubt in order to justify an arrest. (*People v. Coleman* (1977), 50 Ill. App. 3d 1053, 364 N.E.2d 742.) Practically speaking, both the trial court and this court are reviewing the officer's conduct after the fact, and a determination of whether probable cause existed must like-

wise be based upon the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. *People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861; *People v. Gray* (1981), 95 Ill. App. 3d 879, 420 N.E.2d 856.

 Probable cause exists when the facts and circumstances within an arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested committed the offense. *People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861.

In judging whether probable cause existed it must be recognized that police officers must act upon a quick appraisal of the data before them and that the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals. *People v. Walls* (1980), 87 Ill. App. 3d 256, 408 N.E.2d 1056; *People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356.

In addition to the foregoing, it appears that when the defendant and his brother were initially stopped outside their homes on the day after the murder, the defendant was wearing tennis shoes whose tracks appeared to match those found in the victim's blood at the scene of the crime. Also, the defendant's brother was wearing brown suede-type shoes which had blood on them. One of his fingers had been bandaged.

Each defendant signed a consent-to-search form for his residence, and the police found clothing with dried blood on it in the defendant's brother's house. They also found a paper bag containing pairs of socks, toys and cigarette lighters like those on display in the novelty store, plus a lock-blade knife with blood on it in the blower unit of the furnace in the same residence. In a dumpster in the alley behind the defendant's residence the police found a knife, a torn-up customer copy of a receipt for a lock-blade knife from the novelty store, and toy wrappers of the same type as those from the store with the defendant's brother's fingerprints. The police also seized the defendant's belt, which was later found to have blood on it which matched the same blood type as the decedent's.

When the defendant was initially questioned by the police, after being read his *Miranda* rights, he denied any knowledge of the events which had occurred at the novelty store. However, when the defendant was confronted with the fingerprint evidence, he confessed to the murder and robbery of the decedent. He further implicated his brother in the commission of the crime.

When the defendant's brother was told that the defendant had confessed to the killing and implicated him, he acknowledged his guilt

and corroborated the defendant's version of the murder and robbery.

Finally, Mr. Capshaw identified the defendant in a lineup as being in the novelty store with the decedent just before the murder.

■ Based upon the foregoing, we cannot say that the trial court's decision to deny the defendant's motion to suppress statements made and evidence seized was against the manifest weight of the evidence. (*People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861.) Considering the knowledge and information possessed by the police at the time the defendant and his brother were arrested, it is clear that the trial court properly determined that probable cause existed for their arrest.

■■ ■ Finally, the defendant contends the trial court abused its discretion by sentencing him to a term of natural life imprisonment instead of a definite term of years which would allow his eventual release.

The defendant admits that the murder was brutal, but claims it was not premeditated. The defendant further claims that the trial court ignored his evidence in mitigation, specifically that he had a history of substance abuse, particularly alcohol and drugs.

The defendant claims he has rehabilitation potential despite prior convictions for possession of stolen property, armed robbery and aggravated assault (with a knife). It is apparent from our review of the record that the defendant's prior periods of parole and probation failed to deter his criminal conduct.

Following the brutal murder, the defendant showed no remorse whatsoever, and wanted "to party" with the proceeds of the crime. The defendant admitted joking about writing a book concerning the murder which he would call "The Halloween Massacre."

While the defendant acknowledges that a sentence should not be overturned unless there has been a clear abuse of discretion (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541), he argues that in this case, the sentence of natural life imprisonment was excessive, especially in view of the fact that he is only 27 years old.

Although the defendant may be of relatively few years, his prior criminal record sufficiently demonstrates that he is also a recidivist.

> "The day is long past when this court, or any court, should quiver like a pole-axed blancmange at the mention of youth and rehabilitation. These are proper considerations in the fixing of sentences, but they are not the sole elements. The nature of the crime, the protection of the public, deterrence and punishment have equal status in the consideration." *People v. West* (1977), 54 Ill. App. 3d 903, 909, 370 N.E.2d 265, 270.

The defendant and his brother perpetrated the murder of the victim in an extremely brutal manner. The pathologist testified that the decedent suffered 50 to 60 stabbing and slicing wounds. Section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1) permits the imposition of a natural life sentence when the trial court finds that the murder was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." The record indicates that the trial court relied upon this section in imposing the sentence, and in our opinion the trial court was clearly justified in doing so. Furthermore, it is not within our province to reduce the defendant's sentence merely as an act of judicial clemency. *People v. Barber* (1983), 116 Ill. App. 3d 767, 452 N.E.2d 725.

For the foregoing reasons, the judgment and sentence of the circuit court of Peoria County are affirmed with respect to the defendant's conviction for felony murder and reversed with respect to the defendant's conviction and sentence for armed robbery.

Affirmed in part, reversed in part.

STOUDER and WOMBACHER, JJ., concur.