THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DONALD ZUNKER *et al.*, Defendants-Appellants.

First District (3rd Division)   Nos. 1—85—3035, 1—85—3123 cons.

Opinion filed June 14, 1989.

Algis F. Baliunas, of Chicago, for appellant Joseph Nawrot.

Thomas Long, of Chicago, for appellant Donald Zunker.

Cecil A. Partee, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Kathleen A. Bom, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Defendants, Donald Zunker and Joseph Nawrot, were found guilty of murder, in separate, but contemporaneous bench trials. Each defendant was sentenced to serve 20 years in the Illinois Department of Corrections. On appeal, Zunker argues that the trial court erred in denying his motion to quash arrest and suppress evidence. Nawrot argues that he was not proven guilty of murder beyond a reasonable doubt. We affirm.

The following facts were revealed at the hearing on defendants' motions to quash arrest and suppress evidence. On March 10, 1984, the victim, Michael DeMiere, was found dead in the second-floor apartment of a two-flat building located at 1426 West 50th Street, Chicago, Illinois. Chicago police detective Higgins was assigned to the investigation of DeMiere's death. When Higgins entered the apartment, he found the victim lying in a bed in the living room. DeMiere's body was bloody and bruised. In the bathroom, Higgins observed bloodstains on the bathtub, washstand, toilet and floor. There was also blood on the bathroom doorjamb and some loose pieces of plasterboard. The apartment, which was undergoing renovation, was owned by Loretta Howard. Mrs. Howard was allowing DeMiere, who was homeless, to live in the apartment until the renovation was completed and the unit leased.

While Higgins was talking with witnesses on the second-floor rear porch, defendant Nawrot, who lived in the first-floor apartment, came up the stairs, introduced himself and asked what was going on. Nawrot then told Higgins what was to become the first of three versions of the events of March 9, 1984. Nawrot initially told Higgins that he had known the victim for four years and that he last saw him alive at approximately 5 a.m. on March 9, 1984. Nawrot stated that he spent

the previous evening drinking with defendant Zunker and returned home to his apartment between 4 and 5 a.m. After a while, Zunker expressed an interest in renting the second-floor apartment, so Nawrot and Zunker went upstairs to view the unit.

When they entered the apartment they saw DeMiere lying on a bed in the living room. Nawrot kicked the bed and woke DeMiere. DeMiere showed Zunker and Nawrot around the apartment and Nawrot noticed that DeMiere had apparently been involved in a fight. According to Nawrot, one of DeMiere's eyes was swollen. After viewing the apartment, Nawrot and Zunker returned to the first floor and DeMiere joined them to have a beer. Nawrot stated that DeMiere began to stumble around and bang into things so he ordered him out of his apartment. Nawrot related that he heard the victim as he walked upstairs and returned to the second floor.

The next day, Higgins spoke with Doctor Dolz of the medical examiner's office. The doctor informed him that an examination of the victim revealed that he had numerous injuries, including a cervical spine fracture. Dolz stated that the victim would not be able to walk or talk after sustaining the injury. Higgins testified that he returned to Nawrot's apartment and asked him if he would accompany him to the Area 3 police station to answer some additional questions regrading DeMiere's death. Nawrot agreed. After they arrived at the police station, Higgins informed Nawrot that the victim had a fractured spine and would not be able to walk or talk after his injury. Nawrot then told Higgins the second of three versions of the events of March 9, 1984. Nawrot told Higgins that after DeMiere entered his apartment, he became a nuisance, so he pushed him out of the door. Nawrot stated that DeMiere fell to the ground and he and Zunker picked him up and returned him to the second floor. Higgins then asked Nawrot to take a polygraph examination and he agreed. Higgins drove Nawrot to police headquarters at 11th and State Street. Higgins testified that he read Nawrot his *Miranda* rights and left him with the polygraph examiner. After a while, the examiner came into the waiting room and told Higgins that Nawrot was ready to tell everything that happened the previous day. Nawrot then gave an oral statement in the presence of the polygraph examiner and Higgins. In his third version of the events of March 9, 1984, Nawrot admitted that he and Zunker beat Michael DeMiere.

Higgins returned with Nawrot to the Area 3 police station to obtain a written statement. After their arrival, Higgins observed defendant Zunker being interviewed by Chicago police detectives Kwilos and Lane. Higgins joined the interview with Zunker and noted that his

story was the same version that Nawrot had told in their initial interview. Higgins interrupted Zunker and told him that he was just digging a hole for himself and that he should tell the truth. Zunker then agreed to tell the truth. After Lane read Zunker his *Miranda* warnings, he made an oral statement admitting his participation in the beating of DeMiere. The State's Attorney's office was contacted and court-reported statements were taken from Nawrot and Zunker.

Detective Lane and polygraph examiner Walsh also testified on behalf of the State. Lane and Walsh essentially corroborated Higgins' testimony. Detective Lane also testified that he and his partner went to Zunker's home and asked him to accompany them to the police station to answer some questions regarding DeMiere's death. Lane stated that Zunker came voluntarily and that he was not under arrest at that time.

Assistant State's Attorney Botti testified that he was assigned to the case and that he took court-reported statements from both Zunker and Nawrot. He further testified that each defendant read the typed statement, made corrections, initialed each page and signed his name on the last page. Botti testified that he did not promise or witness anyone promise Zunker anything in exchange for his statement. Botti further testified that Higgins told him that he did not make any promises to Zunker.

Defendant Nawrot testified on his own behalf. Nawrot testified that Higgins came to his home at approximately 10:30 a.m. on March 10, 1984, and asked him to come to the police station to make a final statement regarding the death of Michael DeMiere. Nawrot agreed, and Higgins drove him to the police station. Nawrot gave a court-reported statement of the third and final version of the events of March 9.

In his final version of the events of March 9, Nawrot stated that although DeMiere was uninvited, he followed him into his apartment and refused to leave. He stated that he pushed DeMiere onto the back porch and closed the door. After a moment, DeMiere reentered the apartment and asked for a beer. Nawrot refused, and DeMiere called him some names. Nawrot stated that he punched DeMiere in the jaw and pushed him out the door again. DeMiere entered a third time and Nawrot slapped him several times, grabbed him by the collar and walked him upstairs to his apartment. Nawrot stated that he continued to slap and hit DeMiere in the bathroom of his apartment. Nawrot stated that after DeMiere called Zunker a name, Zunker came into the bathroom and punched and kneed DeMiere several times. He stated that Zunker punched DeMiere and he fell to the floor. Nawrot stated

that they placed DeMiere in the bed and covered him with a blanket. Later, he and Zunker attempted to wake DeMiere, but he was unresponsive.

Zunker also testified on his own behalf. He stated that two police officers came to his home at 12:30 p.m. on March 10, 1984. He stated that he had been out all night and was preparing for bed when the officers arrived. He testified that Detective Lane asked him if he would go to the police station to make a statement. Zunker stated that he asked if he had to go and Lane told him yes, pushed back his coat and showed him a gun. Zunker stated that he returned to his apartment, got dressed and joined Lane outside. He testified that Lane held his arm and escorted him to the car. Lane performed a pat down search of Zunker before he entered the car. Zunker then rode to the police station in the back seat of the car. He stated that Lane rode in the back seat with him while the other police officer drove.

Zunker testified that when they arrived at the Area 3 police station, he was taken into a room and photographed. He was then taken to the third floor and placed in a large room. Lane and Kwilos were questioning Zunker when another police officer came in and told Kwilos that he had a phone call. Kwilos left the room and returned about five minutes later. Lane and Kwilos continued to question Zunker for approximately 10 to 15 minutes, after which Higgins arrived. Zunker testified that after Higgins was in the room for a while, he told him, "[Y]ou've already dug your grave, don't bury yourself." Zunker stated that Higgins told him that if he told the truth he would not be charged with murder, it would be either murder or involuntary manslaughter. Higgins then told Zunker the information he had regarding the death of DeMiere and told him to think about it. Zunker then admitted that he participated in the beating of Michael DeMiere.

Zunker testified that after asking some more questions, the officers handcuffed him to the wall and left him alone for about two hours. Zunker stated that he was then transferred to a smaller room where he was handcuffed for about an hour before Higgins and Botti came in. Zunker was later transferred to another room where he gave a court-reported statement. Zunker stated that he was not given his *Miranda* rights until after he made the court-reported statement. He testified that Higgins promised him that he would not be charged with murder if he told the truth.

Following argument, the court denied defendant Nawrot's motion to quash arrest and suppress evidence. As to defendant Zunker, the court found that he voluntarily accompanied the officers to the Area 3 police station and the statement he made after being advised of his

*Miranda* rights was voluntary. The court further found that Higgins did not make a promise to Zunker in exchange for his statement. Based on those findings, the court denied Zunker's motion to quash arrest and suppress evidence.

The court granted the defendants' motions for severance and conducted separate but contemporaneous bench trials. Doctor Hans Dolz, a board-certified forensic pathologist employed by the medical examiner's office, testified regarding his autopsy of Michael DeMiere. Doctor Dolz stated that DeMiere had large bruises on the right side of his head, behind the right ear, on the right side of his face, and on both eyes. The victim also had lacerations on the front left forehead and a small bruise in the center of his forehead. An internal examination of the face and head revealed large areas of bleeding in the scalp and cranial cavity. Dr. Dolz determined that the cause of these injuries was blunt trauma and that the injury could have caused the victim's death.

DeMiere's external chest area had a bruise on the front which extended to the right side of his chest. Dr. Dolz opined that these injuries were also caused by blunt trauma. In total, the victim had 34 external injuries. An internal examination of the victim's chest and abdomen revealed fractures of the front and back ribs on both sides of the chest, and a fracture of the sternum and breast bone. Dr. Dolz concluded that the multiple rib fractures, a condition referred to as flail chest, caused a loss of capacity to support breathing and was a factor which contributed to the victim's death. Dr. Dolz opined that the rib fractures were caused by blunt trauma to the front of the chest. The victim also had a fracture of the cervical vertebrate or neck. Dr. Dolz concluded that the cause of Michael DeMiere's death was multiple severe injuries caused by blunt trauma to the head and chest.

Following arguments, the court found both defendants guilty of murder and sentenced each defendant to serve 20 years in prison. This appeal followed.

Defendant Zunker argues that the trial court erred in denying his motion to quash arrest and suppress statements. It is defendant's position that there was no probable cause for his arrest. Zunker further asserts that because (1) the arresting officers refrained from giving him his *Miranda* rights until after he agreed to make a statement and (2) the statement was given in response to a promise of leniency, it was involuntary. Thus, Zunker concludes that the arrest should be quashed and his subsequent statement suppressed. We disagree.

Probable cause to arrest exists where the facts and circumstances known to the arresting officer would lead a reasonable and prudent man to believe that a crime has been committed and the per-

son arrested committed the crime. (*People v. Kidd* (1989), 180 Ill. App. 3d 1065, 1071.) The voluntariness of a statement is determined by a consideration of the totality of the circumstances and depends on whether the accused's will was overcome at the time of the statement. (*People v. Fuller* (1986), 141 Ill. App. 3d 737, 744, 490 N.E.2d 977, 983.) A trial court's finding of probable cause will not be disturbed on review unless it is against the manifest weight of the evidence. *People v. Ocasio* (1986), 148 Ill. App. 3d 418, 422, 499 N.E.2d 528, 535.

█ Zunker voluntarily accompanied Detectives Lane and Kwilos to the Area 3 police station to make a statement regarding the events of March 9, 1984. Meanwhile, at police headquarters defendant Nawrot told Detective Higgins that Zunker participated in the beating death of Michael DeMiere. After Nawrot made this statement, Higgins telephoned the Area 3 police station and informed Lane and Kwilos that Nawrot had implicated Zunker in the murder. According to Detective Lane, at this point Zunker was not free to go. The trial court found that Zunker was therefore "in custody" following the telephone call. Because it is not necessary that the information available to the police prove a defendant's guilt beyond a reasonable doubt in order to justify an arrest, Lane and Kwilos had sufficient probable cause to detain Zunker after Nawrot implicated him in the murder. (*People v. Wilson* (1985), 132 Ill. App. 3d 862, 865, 478 N.E.2d 556, 559.) We therefore conclude that because the police had sufficient probable cause to arrest Zunker, the trial court's denial of his motion to quash arrest is not against the manifest weight of the evidence.

█ Zunker testified that he was not informed of his *Miranda* rights until after he made the court-reported statement. Zunker also stated that Higgins told him that if he told the truth he would not be charged with murder. Higgins and Lane testified that Lane read Zunker his *Miranda* warnings before he gave his inculpatory oral statement. In addition, Assistant State's Attorney Botti testified and the court-reported statement revealed that Zunker was informed of his *Miranda* rights prior to giving the statement. Higgins denied that he told Zunker that he would not be charged with murder if he told the truth. His testimony was corroborated by Lane and Botti, who stated that they did not witness Higgins make any promises to Zunker. It is up to the trier of fact to determine the credibility of witnesses and to resolve the conflicts in their testimonies. In addition, the court must be persuaded only by a preponderance of the evidence that the statement was voluntary and its findings will not be disturbed unless they are against the manifest weight of the evidence. (*People v. Ocasio* (1986), 148 Ill. App. 3d 418, 429, 499 N.E.2d 528, 533.) Here, the trial court

found that Zunker's statement was voluntarily given. Based on the foregoing, we do not believe that the trial court's decision to deny defendant's motion to suppress his statement was against the manifest weight of the evidence. We therefore conclude that the trial court did not err in denying defendant's motion to suppress.

Defendant Nawrot argues that he was not proven guilty of murder beyond a reasonable doubt. Nawrot contends that the evidence was not sufficient to prove that he knew that his conduct would create a strong probability of death or great bodily harm to the victim. Nawrot also alleges that the victim's death was caused by the acts of his codefendant. We disagree.

■■ ■ It is the responsibility of the trier of fact to determine the credibility of witnesses, and a reviewing court will only substitute its judgment when the evidence is so unsatisfactory or improbable that it creates a reasonable doubt of the defendant's guilt. (*People v. Cooper* (1987), 164 Ill. App. 3d 734, 737, 518 N.E.2d 260, 262.) Further, if two people conspire to do an unlawful act and death occurs as a result of their common action, both are guilty of the homicide. *People v. Terry* (1984), 99 Ill. 2d 508, 514, 460 N.E.2d 746, 749; *People v. Kessler* (1974), 57 Ill. 2d 493, 496, 315 N.E.2d 29, 32.

■ In the instant case, Assistant State's Attorney Botti, Detectives Higgins and Lane, and polygraph examiner Walsh testified that defendant Nawrot confessed to beating DeMiere, providing them with a detailed account of the incident. Defendant's statement was corroborated by codefendant Zunker. The medical examiner testified that the victim's death resulted from multiple severe injuries caused by blunt trauma to the head and chest. The evidence revealed that both Nawrot and Zunker participated in the beating of DeMiere. Because Nawrot participated with Zunker in the beating of DeMiere, he is equally guilty of murder. Therefore, we conclude that based on the evidence adduced at trial, the trial court's finding of guilt was not so improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

FREEMAN, P.J., and McNAMARA*, J., concur.

---

*Justice McNamara participated in this opinion prior to his assignment to the sixth division.