THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NIGEL PINKNEY, Defendant-Appellant.

First District (5th Division)   No. 1—98—1415

Opinion filed September 29, 2000.—Rehearing denied May 9, 2001.—Modified opinion filed May 11, 2001.

708

HARTMAN, J., specially concurring in part and dissenting in part.

Theodore Gottfried, Michael J. Pelletier, and Bonnie Kim, all of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Linda D. Woloshin, and LaTisha Foster, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Defendant, Nigel Pinkney, was convicted at a jury trial of first degree murder for the beating death of George Colton. Defendant was subsequently sentenced to 45 years' imprisonment. Defendant now appeals.

On appeal, defendant argues that (1) he was deprived of his right to a fair jury trial when the trial court gave a nonpattern jury instruction that misrepresented the law of accountability to the jury; (2) he was deprived of his right to a fair jury trial by the trial court's refusal to instruct the jury on the affirmative defense of self-defense and on second degree murder based on unreasonable self-defense; (3) his conviction of first degree murder should be reduced to second degree murder; (4) he was deprived of effective assistance of counsel; (5) he was denied a fair trial where the prosecutor made improper remarks in rebuttal closing argument; and (6) his 45-year sentence for first degree murder was excessive.

We reverse the judgment of the trial court and remand the cause for a new trial, based on the two issues involving jury instructions for those issues are dispositive. Thus, we find that it is not necessary to address the other four issues.

Latonya Colton testified that on January 24, 1997, at approximately 3:45 p.m., she arrived at her grandmother's home at 6928 S. Loomis in Chicago. Her uncle, the victim George Murray Colton, also lived there and was present. After she arrived at the house, Latonya spoke with the victim about an altercation that had taken place between the victim, defendant, and Marlon Hammond earlier that afternoon. Latonya had known defendant for approximately five years. She had only known Marlon for a few months.

Latonya testified that at approximately 4:15 p.m., defendant came into the house to use the telephone. While defendant was on the telephone, the victim said that he was going to pay defendant the money that he owed defendant and that he was going to be "through with him" and was going to "get him."

At this time, Marlon came to the door and the victim told him that he could not come inside. Defendant hung up the telephone, walked to the door, and told Marlon that he could come in. The victim followed defendant to the door and an argument ensued regarding whether Marlon would be allowed into the house. The victim struck defendant in the face with a closed fist, knocking off defendant's glasses and breaking them. A physical struggle ensued. Latonya testified that she could not see everything that happened next, but she did see that the victim's shirt was up and his back was exposed, as if he were being pulled out the front door.

Latonya testified that the next time she saw the victim, he was lying on his stomach on the concrete at the bottom of the seven stairs leading to the front door, with one of his legs caught in the staircase railing. She saw defendant and Marlon begin to kick and stomp on the victim as he lay on the ground. She stated that defendant and Marlon, both wearing boots, repeatedly kicked and stomped on the victim's back and head. She further stated that the victim was unarmed and lay motionless on the ground during the beating.

Latonya testified that, after about two minutes, defendant went back up the stairs and threw his glasses into the house, stating, "So who in the hell is supposed to pay for my glasses." Latonya then watched as defendant walked back outside, walked down two steps, and jumped the remaining distance, landing on the victim's back. As defendant landed on the victim's back, Latonya saw blood coming out of the victim's mouth. She stated that defendant and Marlon then kicked and stomped on the victim again for two or three more minutes before they walked outside of the gated yard area. A few moments later, defendant and Marlon returned to the yard, kicking and shoving the victim with their feet as they told him to get up and that nothing was wrong with him. Defendant and Marlon then left the yard again, got into defendant's car and drove away. Sheila Thornton, a neighbor and friend of the victim's, also testified for the State. Sheila testified that she arrived home, across the street from the victim's house, at approximately 4:15 p.m. on January 24, 1997. She stated that she heard the victim talking loudly, as he was known to do. Sheila said that she next heard the sound of wrestling coming from the victim's house. Sheila then turned and looked across the street to see what was happening.

Sheila saw the victim wrestling in the open doorway with defendant, whom she did not know by name at that time. Sheila saw the victim slip and fall, landing on his stomach on the concrete at the bottom of the stairs with his face toward his house. Sheila testified that she then saw defendant begin to kick and jump on the victim's back. After defendant began to kick the victim, she saw another man, who was standing outside the gate and whom Sheila did not know, enter the yard and also begin to jump on and kick the victim. Sheila observed defendant kicking the victim in the back, jumping onto his back, and stepping on his back several times. Sheila testified that defendant, while wearing boots, kicked the victim between 10 and 15 times. Sheila also stated that the victim did not have any weapons or canes in his hand at that time.

Next, Sheila stated that she saw defendant enter the house and say something that she could not hear, while the second man continued to kick, step on, and jump on the victim. Defendant then exited the house, walked down two stairs and jumped, landing on the victim's back. After defendant landed on the victim's back, he and the other man continued to jump on and step on the victim before leaving the yard together. Sheila testified that defendant and the other man turned to look at the victim, who was not moving. The men went back inside the yard and kicked and stepped on the victim again as they told him to get up and that nothing was wrong with him. Sheila observed both men leave the yard, get into a car, and drive away. Sheila then went to check the victim. Sheila testified that the victim was bleeding badly from his nose and mouth and that his face was swollen. She stated that the victim was unable to talk and that he was not moving.

Doctor John Denton, a forensic pathologist and a deputy medical examiner for the Cook County medical examiner's office, testified that he conducted an autopsy on the victim. He learned that the victim had been treated at Christ Hospital and was pronounced dead on January 26, 1997. Toxicology testing conducted by the hospital upon the victim's admission revealed that the victim had a blood-alcohol level of .166 mg/dl, and that cocaine and another Valium-like drug were present in his system. Dr. Denton described the victim's external injuries as abrasions on the face, right arm and right leg, and bruises on the shoulders. The victim's internal injuries included hemorrhaging in the brain and near the thyroid, fracture of the hyoid bone, contusions on the heart muscle, a laceration and hematoma on the liver, and hematomas on the spleen.

Dr. Denton testified that a severe amount of force was necessary to cause the victim's injuries. He testified that the injuries were consistent with the victim having been repeatedly kicked or struck or

jumped upon. Upon cross-examination, Dr. Denton stated that it was possible that the injuries to the liver and spleen were caused by falling down stairs. Dr. Denton also said that some of the victim's head injuries were consistent with a fall. However, Dr. Denton testified that the fatal chest and head injuries were caused by a beating.

The defendant was the only witness presented by the defense. Defendant was the father of two children by the victim's niece. Defendant stated that he had previously lived at 6928 S. Loomis for a little less than two years and had known the victim for eight years. Defendant claimed that the victim was like an uncle or a brother to him. Defendant stated that the victim used cocaine and alcohol.

Defendant testified that on January 24, 1997, he dropped his children off at their grandmother's house, 6928 S. Loomis, at approximately 3:15 p.m. According to defendant, when he arrived at the house, he saw that the victim had drug dealers selling drugs from the porch. Defendant testified that he asked the victim to "kindly move them guys from off the porch" because his children were in the house. Defendant stated that the victim swore at him and told him to take the children out of the house because he would do what he wanted to. Defendant and the victim then began to argue. Defendant claimed that the victim pushed him, so he pushed the victim back, causing the victim to hit his foot against the curb and fall backward. The victim was not injured and defendant went inside to use the telephone. After speaking on the phone and visiting with his children, defendant stated that he left with Marlon.

Defendant returned to the house a short time later. He observed the victim standing in front of the house drinking a bottle of whiskey. Defendant stated that he told the victim, "We don't need to be fighting. I got my kids over here and I don't need enemies around because I come around too much." According to defendant, the victim responded, "I'm going to pay your money and I'm going to deal with you later." However, defendant testified that he did not interpret the victim's remark as a threat. Defendant then went into the house and left again with Marlon a short time later.

Defendant testified that he returned to the house with Marlon at approximately 4 p.m. Defendant went inside to use the telephone and as he made his call, he heard the victim speaking to him. According to defendant, the victim said, "I'm going to get you ***. I'm going to get you[.] *** [A]fter I get you, I'm going to *** you up. My brother's going to come over here and I'm going to get you." Defendant testified that he ignored the victim's comments. Marlon then tried to come into the house and the victim walked over and slammed the door in his face. Defendant opened the door and told Marlon that he could come

in. Defendant testified that the victim protested and attempted to grab his mother's cane to come after him.

According to defendant, the victim pushed him in the face and punched him. Defendant testified that the victim's punch caused him to black out for a second. Defendant stated that while standing near the front door the victim was bent over and had defendant's head in a headlock, from which defendant was trying to free himself. Defendant testified that the victim hit his own head on the railing and let go of defendant. Then, both defendant and the victim fell down the stairs.

Defendant testified that the victim fell to the bottom of the stairs, while defendant fell to the middle of the stairs, pulled himself up, and went down the stairs behind the victim. Defendant admitted that, once he reached the bottom of the stairs, he kicked the victim in the lower part of his body approximately six or seven times. According to defendant, he was in a dreamlike state at the time and just reacted because he was attacked. Defendant stated that he stopped kicking the victim when he heard Latonya say, "You all going to kill him." Defendant denied jumping on the victim, stomping on him, kicking him in the head or stepping on his neck.

Defendant stated that he then went into the house, determined that his glasses were crushed and said, "Who the hell going to pay for my glasses?" Defendant admitted that he was angry that his glasses were broken. After he received no response, defendant threw his glasses down and went out the door. Defendant asserted that when he came outside again, he saw Marlon stomping on the victim's head with the heel of his foot. Defendant explained that the victim, who was lying on the pathway between the stairs and the gate, was blocking his path so defendant either had to walk over him or jump, so he chose to jump. Defendant walked down to the second step from the top and jumped, landing on the victim's back. Defendant explained that he did not intend to jump on the victim's back but the stairs were slippery due to the snow and ice. In addition, defendant commented that if he had jumped in the bushes instead of on the victim, he would have "messed [himself] up even more." Defendant testified that after he landed on the victim, he and Marlon left. Defendant denied kicking or stomping on the victim prior to his departure.

Defendant testified that when he spoke with the victim's niece two days later, he learned that the victim was dead. After speaking with his mother, defendant stated that he contacted the police because he wanted to prove his innocence. Accompanied by Detective Bunch, defendant turned himself in to police.

Defendant testified that his only intent was to defend himself. Defendant denied that he intentionally or knowingly beat, kicked, and

killed the victim. He also denied that he kicked and killed the victim knowing that such a beating and kicking would cause a strong probability of death or great bodily harm to the victim.

In rebuttal, the victim's mother testified that she was present in the house during the altercation and her son never tried to grab her cane.

During the jury instruction conference, defendant requested that the jury be instructed regarding self-defense and second degree murder. The trial court declined defendant's tendered instructions based upon the evidence presented. However, the next morning, defendant renewed his request for a second degree murder instruction, this time based upon serious provocation resulting from mutual combat. The trial court reconsidered and deemed that a jury instruction on second degree murder based upon serious provocation was warranted.

After closing arguments, the jury convicted defendant of first degree murder. At the conclusion of a hearing, the trial court denied defendant's motion for a new trial. Defendant was sentenced to 45 years' imprisonment, and his motion to reduce sentence was denied. Defendant now appeals.

Defendant first argues that he was denied a fair trial where the trial court gave a nonpattern jury instruction regarding cause of death, which misrepresented the law of accountability to the jury.

■◖ The State responds that defendant has waived this issue because he failed to specify these grounds in his motion for a new trial. In order to preserve a question for appellate review, both a trial objection and a written posttrial motion raising the issue are required for alleged errors that could have been raised during trial. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988). Furthermore, a defendant's general contention in the motion for new trial that the trial court erred in giving and refusing instructions is not sufficient to inform the court of its error. *People v. Smalley*, 10 Ill. App. 3d 416, 426, 294 N.E.2d 305 (1973).

■ In the instant case, defendant claims that he preserved this matter for appellate review in his motion for a new trial by stating that the trial court "erred in refusing the Defendant's requested jury instruction and giving instructions over objection." In his motion for a new trial, the quoted statement is followed by a specific reference only to the trial court's denial of defendant's requests for self-defense instructions. At no point in the motion for a new trial does defendant mention the nonpattern instruction. The posttrial motion could have specified the disputed instruction as a basis for a new trial without consulting a transcript. Therefore, we find that defendant failed to preserve this issue for appeal.

However, where the evidence is closely balanced or the errors complained of are of such magnitude that they deprive defendant of a fair trial, the reviewing court will invoke plain error and review the alleged trial error. *People v. Mullen*, 141 Ill. 2d 394, 402, 566 N.E.2d 222 (1990). Since the alleged instructional error is of such magnitude that the defendant was deprived of a fair trial, we invoke the plain error doctrine and consider the merits of defendant's argument.

In this case, the State presented two alternative theories of guilt. The State argued that either defendant actually caused the victim's death by beating him or defendant was legally accountable for the victim's death. Defendant testified that his own use of force was nonfatal as he only kicked the victim six or seven times in his midsection. Defendant also argued that he should not be accountable for the victim's death because he did not solicit, aid or abet Marlon in the beating.

After defendant's closing argument, the State proposed a nonpattern jury instruction relating to the cause of death. The State claimed that defendant made cause of death an issue when he argued that Marlon, not defendant, administered the kicks that killed the victim. Defendant objected to the instruction, arguing that distinguishing defendant's actions from Marlon's actions did not raise an issue necessitating the State's cause of death instruction. Over defendant's objection, the trial court issued the following nonpattern instruction:

> "In order for you to find the acts of the defendant caused the death of George Colton it is not necessary that you find the acts were the sole and immediate cause of death, but you must find beyond a reasonable doubt that they were a contributing factor such that the death did not result from a source unconnected with said acts."

During rebuttal closing argument, the State used this instruction to bolster the accountability theory. The State explained to the jury that it should hold defendant accountable for Marlon's conduct because Marlon was not a source unconnected to defendant. In his appellate brief, defendant points to the following portion of the State's rebuttal argument:

> "That's why the law of responsibility is the way it is. He's not allowed to come in later on and say I'm not guilty because I didn't do as much as the other guy.
>
> Well what one can think about, two can do. And two did. They both share equally in the responsibility. And you cannot limit his responsibility on that.
>
> The testimony was that he kicked and stomped him in the head. Now he may pretend that didn't happen. He may pretend that La-

tanya [*sic*] and Sheila didn't say that. He may hope it. He may pray it. He may wish it. But they did. They saw it. You heard them tell you in no uncertain terms.

But any way, all that stuff doesn't really matter. Because it really doesn't matter. If for some reason some of you believe that he didn't kick him in the head—I don't know why you would want to do that, but say you do. It still doesn't matter.

Judge Reyna will instruct you that in order for you to find the acts of the defendant caused the death of George Colton it is not necessary that you find the acts were the sole and immediate cause of death, but you must find beyond a reasonable doubt that they were a contributing factor such that the death did not result from a source unconnected with said acts.

Can you sit there and honestly say even if you believe that load that the death resulted from unconnected acts? Can you really believe that? Of course not. These acts were connected. They're as connected as my arms to my shoulders, as my hands in my pockets.

Were these unconnected acts? It's not like while they were beating him he got struck by lightening [*sic*]. It's not like while they were beating him some unknown strangers came up and shot him in a drive by.

Blunt force trauma. And you know he applied the blunt force to the head, face, body, along with Marlon, and even if for some reason some of you believe he didn't, that he just kind of (knocking sound) a few times, he's still guilty of first degree murder."

Defendant states that this argument used the cause of death instruction to argue that if the jury believed that Marlon administered the fatal kicks, defendant should still be found guilty of first degree murder because Marlon was not an independent source, not because defendant was responsible for Marlon's actions.

■ The sole function of jury instructions is to convey to the jury the correct principles of law applicable to the evidence submitted to it in order that, having determined the final state of facts from the evidence, the jury may, by the application of proper legal principles, arrive at a correct conclusion according to the law and the evidence. *People v. Gambony*, 402 Ill. 74, 81-82, 83 N.E.2d 321 (1948). Jury instructions should not be misleading or confusing. *People v. Bush*, 157 Ill. 2d 248, 254, 623 N.E.2d 1361 (1993). Moreover, there must be sufficient evidence in the record to support an instruction, lest the jury be confused by issues improperly before it. *People v. Clark*, 32 Ill. App. 3d 926, 931, 337 N.E.2d 291 (1975).

■ We find that the cause of death instruction was misapplied in this case and has no basis in the evidence. Contrary to the State's assertion at trial, a cause of death instruction is provided in Illinois Pat-

tern Jury Instructions, Criminal, No. 7.15 (3d ed. 1992) (hereinafter IPI Criminal 3d). IPI Criminal 3d No. 7.15. states:

> "In order for you to find that the acts of the defendant caused the death of [the victim], the State must prove beyond a reasonable doubt that defendant's acts were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole and immediate cause of death."

The language of IPI Criminal 3d No. 7.15 is substantively equivalent to the instruction that was given in this case. The committee note to IPI Criminal 3d No. 7.15 states that the instruction should be given whenever causation is at issue. IPI Criminal 3d No. 7.15, Committee Note, at 174. However, the cases that are cited by the committee suggest that the instruction was created to be given where an intervening and alternative explanation for the cause of death is argued by the defense.

For example, in the hypothetical case given in IPI Criminal 3d No. 27.06 (sample set of instructions), the defendant shot his neighbor, who died in the hospital six weeks after the shooting and after a second surgery. At trial, the hypothetical defendant provided evidence that the neighbor's doctors mishandled the case, that the neighbor's second surgery was due to malpractice during his first surgery, and that he might have recovered from his gunshot wounds but for this malpractice. In this sample case, a cause of death instruction was proper in order to explain to the jury that the defendant could still be criminally liable, even though the doctors' mishandling of the case contributed to the neighbor's death.

There was no evidence or argument in the present case that an intervening event outside of the beating was the cause of the victim's death. The defense did argue that the victim died as a result of the beating administered by Marlon and not as a result of the actions of defendant. The relevant question to be answered was, even if the jury believed this theory, was defendant responsible for Marlon's actions at that time? Thus, the State's argument that defendant was criminally liable for the victim's death was appropriately addressed by the instructions on accountability, not cause of death. In the case *sub judice*, the cause of death instruction allowed the jury to hold defendant responsible for Marlon's conduct without finding that the State had proven that defendant was accountable for that conduct beyond a reasonable doubt. The error caused by the instruction itself was then compounded by the State's rebuttal argument, which represented to the jury that if it found that Marlon actually dealt the fatal blows to the victim, it could convict defendant of murder as long as his acts were "connected" to Marlon's acts.

The jury received IPI Criminal 3d No. 5.03, which provides:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.

The word 'conduct' includes any criminal act done in furtherance of the planned and intended act." IPI Criminal 3d No. 5.03.

On appeal, the State argues that there is no conflict between the causation instruction and the accountability instruction. A simple reading of the two instructions belies this argument. This is especially apparent where the causation instruction given did not include the accountability language as required by the committee note to IPI Criminal 3d No. 7.15. Had the State included the accountability language, the instruction would have read:

"In order for you to find that the acts of the defendant, or one for whose conduct he is legally responsible, caused the death of George Colton, the State must prove beyond a reasonable doubt that defendant's acts, or the acts of one for whose conduct he is legally responsible, were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant, or one for whose conduct he is legally responsible. However, it is not necessary that you find the acts of the defendant, or one for whose conduct he is legally responsible, were the sole and immediate cause of death." ·

See IPI Criminal 3d No. 7.15, Committee Note, at 174.

When accountability language is added to IPI Criminal 3d No. 7.15, it should be readily apparent that it would be confusing to a jury to receive this instruction in cases where several persons participate in a beating. These factual circumstances are covered by Illinois' "common design" rule, which is incorporated by our law on accountability. Where two or more persons engage in a common criminal design or agreement, any acts in the furtherance thereof committed by one party are considered to be the acts of all parties to the common design, and all are equally responsible for the consequences of those further acts, including murder. See *People v. Terry*, 99 Ill. 2d 508, 514, 460 N.E.2d 746 (1984); *People v. Zunker*, 184 Ill. App. 3d 816, 823, 540 N.E.2d 884 (1989); *People v. Wade*, 51 Ill. App. 3d 721, 727, 366 N.E.2d 528 (1977).

The State argues that IPI Criminal 3d No. 7.15 should be given in any case where causation of death is raised. If this were so, defendants prosecuted based on the "common design" rule could have their juries instructed with IPI Criminal 3d No. 7.15. These defendants could then

argue that their actions were not a "contributing cause of death." We reject the State's argument.

Therefore, we find that the trial court's issuance of the instruction on cause of death was misleading to the jury and was reversible error.

Defendant next argues that he was denied a fair trial where the trial court refused to instruct the jury on the affirmative defense of self-defense and on second degree murder based on unreasonable self-defense. Defendant asserts that there was evidence before the court that the victim threatened and assaulted him and that defendant believed the victim was a continuing threat; thus, the lack of jury instructions based on a theory of self-defense was reversible error. We agree.

■ The trial court's refusal to issue a specific jury instruction is reviewed under an abuse of discretion standard. *People v. Jackson*, 304 Ill. App. 3d 883, 889, 711 N.E.2d 360 (1999); *People v. Kidd*, 295 Ill. App. 3d 160, 167, 692 N.E.2d 455 (1998). As defendant points out, our supreme court in *People v. Everette*, 141 Ill. 2d 147, 157, 565 N.E.2d 1295 (1990), stated that "[i]t is a matter of law whether the defendant has met the evidentiary minimum entitling him to instructions on an affirmative defense." However, no court in Illinois has interpreted that statement as an intent by the supreme court to change the standard of review for jury instructions to a *de novo* standard, as defendant argues, and we refuse to interpret it as such.

Rather, we rely on a later opinion, *People v. Jones*, 175 Ill. 2d 126, 131-32, 676 N.E.2d 646 (1997), where the court held:

> "A defendant is entitled to an instruction on his theory of the case if there is some foundation for the instruction in the evidence, and if there is such evidence, it is an abuse of discretion for the trial court to refuse to so instruct the jury. *People v. Crane*, 145 Ill. 2d 520, 526 (1991). Very slight evidence upon a given theory of a case will justify the giving of an instruction. [Citations.] As the appellate court dissent noted: 'In deciding whether to instruct on a certain theory, the court's role is to determine whether there is some evidence supporting that theory; it is not the court's role to weigh the evidence.' 276 Ill. App. 3d at 1012 (Cook, P.J., dissenting); [citation]."

■ A defendant is entitled to have the jury instructed on any legally recognized defense theory that has some foundation in the evidence. *Jackson*, 304 Ill. App. 3d at 889. Whether such an instruction is warranted depends on the facts and circumstances of each case. *Jackson*, 304 Ill. App. 3d at 890.

■ An instruction for self-defense is given in a homicide case where there is some evidence in the record which, if believed by a jury, would

support a claim of self-defense. *Everette*, 141 Ill. 2d at 157. Self-defense is an affirmative defense, meaning that unless the State's evidence raises the issue involving the alleged defense, the defendant bears the burden of presenting evidence sufficient to raise the issue. 720 ILCS 5/3—2, 7—14 (West 1998).

IPI Criminal 3d No. 24—25.06 states:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

IPI Criminal 3d No. 7.05A further states:

"A mitigating factor exists so as to reduce the offense of first degree murder to the lesser offense of second degree murder if at the time of the killing the defendant believes that circumstances exist which would justify the deadly force he uses, but his belief that such circumstances exist is unreasonable."

According to the committee comments accompanying the statutory codification of self-defense, the general rule as to self-defense contains several propositions: (1) the defendant was not the aggressor; (2) the danger of harm was a present one; (3) the force threatened must have been unlawful—either criminal or tortious; (4) the person must actually believe that the danger exists, that his use of force is necessary to avert the danger, and that the kind and amount of force which he uses is necessary; and (5) the defendant's belief, in each of the aspects described, is reasonable even if it is mistaken. 720 ILCS Ann. 5/7—1, Committee Comments—1961, at 292 (Smith-Hurd 1993). When the evidence supports submitting an instruction on justifiable use of force, a tendered instruction on second degree murder based on the unreasonable use of force should also be given. *People v. Lockett*, 82 Ill. 2d 546, 553, 413 N.E.2d 378 (1980).

This court may consider the defendant's testimony, his intent or motive, whether there was any sort of physical contact between the defendant and the victim, the type of wound suffered by the victim, and the circumstances surrounding the incident to determine whether a defendant has successfully raised the issue of self-defense. *Everette*, 141 Ill. 2d at 158.

We find that the evidence presented at trial was sufficient to warrant jury instructions regarding self-defense. In this case, defendant tendered IPI Criminal 3d No. 24—25.06 on the justifiable use of force and IPI Criminal 3d No. 7.05A on second degree murder based

on the unreasonable use of force. The trial court refused both instructions, stating that the evidence did not warrant self-defense instructions because defendant had not shown that he believed he was justified in using deadly force. We disagree.

Latonya and defendant both testified that the victim made threatening remarks directed at defendant shortly before the victim engaged defendant in a verbal argument. They also testified that the victim was the aggressor, throwing the first punch and hitting defendant in the face with enough force to knock defendant's glasses off. Defendant testified that the victim then put him in a headlock, they struggled, and they both fell down the stairs. Defendant then admitted that he got up, went over to the victim, who was lying on the ground, and kicked him six or seven times. Defendant stated that his only intent was to defend himself and that he believed the victim was still capable of attacking him.

As shown above, evidence was before the court that the victim was the aggressor, the danger of harm from the victim was a present one, and the force threatened by the victim was unlawful. Defendant also testified that he believed that the danger existed, that he needed to use force to avoid the danger, and that the kind and amount of force which he used were necessary. In deciding whether to instruct on a certain theory, the court's role is to determine whether there is some evidence supporting that theory; it is not the court's role to weigh the evidence. *Jones*, 175 Ill. 2d at 132. Thus, the determination of whether the evidence was credible, and then whether defendant's subjective belief was reasonable, should have been left to the jury. See *Lockett*, 82 Ill. 2d at 552.

Therefore, we hold that the trial court abused its discretion in refusing to give self-defense instructions to the jury because defendant presented sufficient evidence to warrant giving such instructions.

Based on the foregoing, we reverse the trial court's judgment and remand the cause for a new trial.

■ Defendant also asserted on appeal that he received ineffective assistance of counsel at trial, that the prosecutor's comments in closing arguments were improper, and that the 45-year sentence he received was excessive. We find it unnecessary to consider these issues because we have reversed the judgment of the trial court and remanded the cause for a new trial on other grounds.

■ In a petition for rehearing defendant asked us to address his contention on appeal that, based on the evidence in this case, he should have been found guilty of second degree murder. Defendant also asks that, if we fail to reduce his conviction to second degree murder, we should hold that the most serious offense he may be tried for upon

remand is second degree murder. In response, we find that all the evidence, as set forth above, provided a sufficient basis for the jury to conclude beyond a reasonable doubt that defendant was guilty of first degree murder. Accordingly, we decline to reduce defendant's conviction to second degree murder and we find that principles of double jeopardy do not preclude defendant's retrial for first degree murder. *People v. Shief*, 312 Ill. App. 3d 673, 680, 728 N.E.2d 638 (2000).

Reversed and remanded.

THEIS, J., concurs.

JUSTICE HARTMAN, specially concurring in part and dissenting in part:

I concur with the majority decision to reverse the judgment of the circuit court and remand the cause for a new trial; however, I dissent from the majority's finding that the court abused its discretion in refusing to give self-defense instructions to the jury.

Defendant testified that he and the victim engaged in a scuffle at the top of the staircase before both fell down the stairs. After defendant fell to the middle of the stairs, he stood up, walked to the bottom of the stairs where the victim lay, and kicked the victim approximately six or seven times; he only stopped kicking the victim after a witness yelled. Defendant then went into the house, became angry about his broken glasses, went back outside, walked down to the second stair and jumped, landing on the victim's back. He attempted to jump over the victim so that he would not get "messed *** up" by jumping in the bushes.

These facts and circumstances do not warrant a self-defense instruction. The witnesses' testimony and the wounds suffered by the victim demonstrate that, at the time defendant kicked the victim several times and jumped on the victim's back, the victim presented no threat to defendant. The physical contact between the two men had ended. In addition, defendant's own testimony indicates that his jump onto the victim's back had nothing to do with defending himself. Under these facts, I cannot agree that the circuit court abused its discretion in denying the tender of self-defense instructions.

Accordingly, I concur in the majority's result but dissent from the majority's finding that the circuit court erred in denying defendant's request for self-defense instructions.