THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARCELL PRINCE, Defendant-Appellant.

First District (4th Division)    No. 1—02—2706

Opinion filed December 8, 2005.

Edwin A. Burnette, Public Defender, of Chicago (Bruce C. Landrun, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (James Fitzgerald, Peter Fischer, and Jessica R. Ball, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant

Darcell Prince was found guilty of first degree murder, armed robbery and false personation of a police officer. The trial court sentenced defendant to 50 years in prison for murder, 25 years in prison for armed robbery and 5 years in prison for false personation of a police officer, with the sentences to be served concurrently. Codefendant Leo Foster had a simultaneous dual jury trial; his case is before this court in a separate appeal. Defendant appeals, arguing that the trial court erred in: (1) denying defendant's motion to suppress a lineup identification; (2) refusing to remove his jury for certain cross-examination conducted by codefendant's counsel; (3) admitting testimony regarding a statement defendant made to Ohio police; (4) admitting hearsay; (5) refusing to give one of defendant's proffered jury instructions; (6) admitting victim impact testimony; and (7) imposing an excessive sentence. For the following reasons, we affirm.

The record discloses the following facts. Shawanna Fields testified that in October 1999, she was engaged to and living with Huey Rich on the corner of 80th Street and Crandon in Chicago. Fields' four-year-old son also lived there. Fields was employed as a dental assistant; Rich worked part-time as a hair stylist while studying for his license.

On October 18, 1999, shortly after 5:20 p.m., Rich, Fields and her son ran some errands, including stopping to look at a house, then picked up a pizza and drove home. As they neared their apartment, Rich and Fields saw Andre Williams on the 7900 block of South Crandon. Rich told Fields he wanted to ask Williams a question. Rich grabbed a bag of beer and walked toward Williams, while Fields and her son took the pizza and walked toward their building. Fields saw two men in the general direction of Rich and Williams.

While standing in the vestibule of the building, Fields heard Rich scream something, then saw him running and heard a gunshot as he ran past the door. Fields opened the door to the building and saw the two men chasing Rich. She lost sight of them, then heard another gunshot. Fields ran upstairs with her son and called 911. The police arrived approximately five minutes later. Fields went downstairs, where she learned Rich had been shot and taken to Christ Hospital.

Fields described the two men to the police as follows: (1) African-American, about 6 feet 2 inches, light or medium skin complexion, wearing beige boots; and (2) African-American, about 5 feet 9 inches, with dark complexion wearing a white skullcap. Field later identified codefendant Foster from a photo array, but testified that she saw one man better than the other.

Williams testified that he met up with Rich at approximately 8:15 p.m. Williams described the two men that approached him and Rich as

a tall African-American with light complexion, wearing a white skullcap, black jacket and white pants and a shorter African-American with a medium complexion, wearing a black skullcap and black clothes. When they approached, they stood about one foot from Rich. Williams identified the defendant and codefendant in court as the two men.

Williams testified that defendant and codefendant announced themselves as police, with codefendant flashing a gold police badge. Williams believed the two were undercover officers. Defendant held a gun on Williams, while codefendant had Rich on the back of a car. Rich told codefendant he had not seen the badge. After codefendant showed Rich the badge, the two men scuffled. Codefendant produced a bluesteel revolver. Rich knocked codefendant to the ground and began to flee the scene. Defendant produced a silver gun and began shooting at Rich. The two men then began chasing Rich. Williams lost sight of them as they rounded a corner but heard five or six gunshots in total.

Williams ran to his relatives' house on Crandon and asked them to call the police. Williams then ran up the street, finding Rich in a puddle of blood next to his building. Williams went to get medical help, but the police and an ambulance arrived at the scene before he returned.

Later that evening, Williams spoke with police and helped Detective Laughran in preparing a composite sketch of defendant. On October 20, Williams testified that he first identified codefendant from a photo array. In another session the same day, Williams picked a picture of defendant from a photo array but told police he would have to see him in person to be 100% sure. On October 23, Williams identified codefendant in a lineup at Area 2 police headquarters. In December 1999, Williams identified defendant in a lineup at Area 2 police headquarters. Williams testified that when he saw defendant, Williams tried to break through the glass separating them and had to be restrained by the police.

Patrick O'Brien, who knew Rich from the neighborhood, testified that he heard a "firecracker sound," then saw Rich being chased by a taller man wearing a white skullcap and a shorter man wearing black clothes, who was shooting a gun as he ran. O'Brien dialed 911. When O'Brien returned to the scene, he saw the men dragging Rich by the armpits and trying but failing to enter a building from 80th Street. The taller man then ran to a large, dark Chevrolet parked near 2252 E. 80th Street, got into the car and drove it to where the other man was standing. The other man got into the passenger side of the car, which sped away.

Robert Lilly testified that he was in his home at 7958 S. Oglesby when he heard gunfire. Looking out his back door, he saw an African-

American man running past Lilly's car and another person moving side to side several times near his car. Lilly dialed 911, then returned to his back door. Lilly saw an African-American man wearing light-colored pants, a dark jacket and a white skullcap run up onto the sidewalk across the street with a firearm in his hand. Lilly saw the man raise his arm and point the gun in an easterly direction. Lilly then heard another gunshot, at which point Lilly backed away from the door for a few minutes.

Sharon Hill testified that in October 1999, she lived with codefendant in a two-level house; codefendant's cousin, Versie McKinney lived upstairs. Hill knew defendant through codefendant. At approximately 7 p.m. on October 18, Hill allowed codefendant to borrow her Ford Crown Victoria. Hill testified that defendant and codefendant appeared at the apartment at approximately 9:30 p.m. According to Hill, defendant was wearing a white sweatsuit and cap. Hill testified that there was blood on defendant's shirt, which he wiped off with a towel. Hill also noticed blood on codefendant's boots. Someone later asked Hill to wash the boots, which she did. Later, Hill saw defendant pull money out of his pocket and hand it to codefendant, who then handed it to Hill. There was blood on the money, which codefendant asked her to wash. Hill washed the bills and set them to dry; afterward, defendant and codefendant split the money and left the apartment together. Later that night, codefendant returned while she was watching a television news story on the Rich shooting. Codefendant told Hill not to drive the Crown Victoria and she did not drive it thereafter.

A number of Chicago police personnel testified regarding their roles in the investigation of the Rich shooting. Forensic investigator Daniel Grzemski testified that he and his partner, forensic investigator Lynn Lopit, were assigned to the case at approximately 9:05 p.m. on October 18, 1999. After speaking with beat officers, he and Lopit began to process the scene, taking photographs, identifying and collecting evidence, later sending such evidence to the appropriate discipline of the state laboratories for analysis. Evidence recovered from the scene included: a 9-millimeter shell casing; several footprints near a pool of blood outside the door to the building on 80th Street; and a pack of cigarettes and matchbook found near the location where the getaway car was said to have been parked. After the initial processing of the scene, Grzemski later learned that the door at 2360 E. 8th Street needed to be processed also. Grzemski and Lopit returned to the scene to do so and also recovered a dollar bill from the pool of blood.

Detective George Karl testified that on October 19, the police

received a telephone call from Versie McKinney, which prompted him and Sergeant Walsh and Detectives Pesavento and Almazon to visit McKinney and her family. Detective Karl testified that Versie told the police that on October 18, she saw defendant and codefendant enter her apartment and immediately go to the bathroom to wash. Detective Angelo Pesavento testified that Versie also provided a last known address for codefendant and a physical and clothing description of the other man, "Kojak." According to Detective Pesavento, Versie said that "Kojak" was approximately 6 feet 2 inches and was wearing white sweatpants, a dark jacket and a white skullcap.

After the conversation, the police set up surveillance on the Crown Victoria parked nearby. Detective Pesavento later used a computer to help identify "Kojak," with Detective Pesavento determining that defendant fit both the nickname and description.

Detective Stan Brownfield testified that he and his partner were watching the Crown Victoria on the morning of October 20, 1999. Although they observed no activity at the car or nearby home, when they were leaving the area, they observed a group of people arguing in the back alley. The detectives were approached by one of these people, Sharon Hill. Detective Brownfield asked Hill about the Crown Victoria, which she said belonged to her, but that codefendant had the keys. The detectives obtained Hill's consent to search the car, but only looked into it, noting dark stains and a shoe print on the carpet of the passenger side. The police then had the car towed to a police pound. Forensic investigator John Stout testified that he processed the Crown Victoria, collecting the floor mats, a section of carpeting and swab samples.

Detective Brownfield and his partner then brought Hill to the police station, where she told them what she saw on the 18th and identified a picture of "Kojak." The detectives then went to defendant's last known address and left a business card with a woman who said that defendant only received mail at that address. Thereafter, defendant telephoned Detective Brownfield and said he was willing to speak with the police, but he wanted to know the subject of the discussion. Detective Brownfield responded that he wanted to talk about codefendant; defendant replied that he knew codefendant but did not run with him anymore. Detective Brownfield asked defendant to come to the police station; defendant agreed to do so in that call and a later call, but never actually did so.

On October 22, 1999, Detective Pesavento learned that Rich had died. Shortly thereafter, he brought Williams, Versie and her family down to the Area 2 police station. Detectives and assistant State's Attorneys spoke with Versie and 16-year-old Patricia McKinney, who was

accompanied by a guardian. The assistant State's Attorneys took handwritten statements from each regarding what he or she saw on the night of October 18. Versie's statement was substantially similar to what Detective Pesavento testified she had told the police earlier. At trial, Versie and Patricia testified that their statements had been coerced—claims denied by Detective Karl and the assistant State's Attorneys in their trial testimony.

Columbus, Ohio, police officer Stanford Speaks testified that he was working on the night of December 20, 1999, when he was contacted by the FBI regarding a homicide suspect named Darcell Prince. Afterward, Officer Speaks obtained a photograph of defendant and set up surveillance at 419 Wilson Avenue in Columbus. At approximately 8 p.m., Officer Speaks saw defendant leave the building, at which point the FBI ordered defendant to the ground while Officer Speaks handcuffed him. While taking defendant to the police station, Officer Speaks asked defendant a number of routine questions incidental to placing defendant in the system, such as name and date of birth. Officer Speaks asked defendant how long he had been in Columbus, which he testified was a routine question. Defendant answered that question, but then added that he had left Chicago because he was under investigation for a homicide and left so he would not be charged. Defendant added that he was being charged because another person was accusing him and the codefendant had blood on his boots. While defendant was being processed at the police station, Officer Speaks noticed a tattoo on defendant's left arm that read, "Kojak."

Angel Trawick testified that she had known defendant for four or five years and had a daughter by him. Trawick testified that defendant and she both smoked Newport cigarettes throughout their relationship.

Cook County Deputy Medical Examiner Dr. John Scott Denton testified that his examination of Rich showed that Rich died of multiple gunshot wounds and the cause of death was homicide.

The physical evidence in this case was submitted to the Illinois State Police Forensic Science Center for examination by a number of experts. Each expert testified that his or her test results are peer reviewed and verified by another examiner in the lab.

Forensic biologist Jennifer Schultz examined the floor mats, carpet and swabs collected from the Crown Victoria, concluding that the items tested positive for the presence of blood.

Forensic biologist Ken Pfoser performed DNA testing of a sample swabbed from the floor mat collected from the Crown Victoria. Pfoser concluded, to a reasonable degree of scientific certainty, that the blood was consistent with having originated from Huey Rich.

Forensic biologist Daniel Otto performed similar DNA testing on the original swabs taken from the Crown Victoria and came to the same conclusion.

Forensic scientist Anastasia Petruncio, who specializes in impression evidence, testified as an expert in footwear impressions. Petruncio compared codefendant's boot with the floor mats and carpeting collected from the Crown Victoria. Petruncio opined that the boot shared the same pattern as the impression, but she could not say that the boot made the impression, given the lack of specific characteristics in this case.

Forensic scientist Deborah McGarry testified as a latent fingerprint examiner. McGarry examined the box of Newport cigarettes and the matchbook collected near the scene of the shooting. McGarry concluded that the cigarette box bore no impressions suitable for analysis. McGarry opined that, to a reasonable degree of scientific certainty, a latent fingerprint on the matchbook was made by defendant's left index finger. McGarry did not count points of similarity between the two prints, but viewed the impressions as a whole, looking at the ridge flow and characteristics, scars, creases, incipient ridges, pores and contours.

After the State rested, the parties stipulated that Brittany Robinson would testify that she heard the gunshots and saw two African-American males chasing another man; one was wearing a white hat. It was also stipulated that an Officer Meister would testify that he recovered $1.91 from a nurse who retreived it from Rich's pocket. It was stipulated that Detective Pesavento would testify that Officer Speaks did not tell him that defendant had referred to bloody boots. It was further stipulated that an Officer Gunter would testify that he briefly interviewed Fields and Williams on the night of the shooting, that both were very upset and that one of them described the taller offender as wearing a black skullcap.

Following closing arguments and jury instructions, the jury deliberated and found defendant guilty of first degree murder, armed robbery and false personation of a police officer. The trial court denied defendant's posttrial motion for a new trial. After hearing evidence in aggravation and mitigation, the trial court sentenced defendant to 50 years in prison for murder, 25 years in prison for armed robbery and 5 years in prison for false personation of a police officer, with the sentences to be served concurrently. The trial court denied defendant's postsentencing motion. Defendant now appeals his conviction and sentence.

## I

Defendant first argues that he was denied due process because his

pretrial lineup was unnecessarily suggestive and conducive to irreparable mistaken identification in violation of *Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972). The State contends that defendant has waived this issue by failing to object to the identification testimony at trial. The State's position may have merit. See *People v. Pierce*, 52 Ill. 2d 7, 10, 284 N.E.2d 279 (1972). However, our supreme court has been reluctant to apply the waiver rule on this issue. See *People v. Brooks*, 187 Ill. 2d 91, 143, 718 N.E.2d 88, 117 (1999) (Freeman, J., specially concurring, joined by Bilandic and McMorrow, JJ.). Accordingly, we turn to address the merits.

■ Defendant has the burden of proving that the identification procedures were so unnecessarily suggestive as to give rise to a substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968). Courts must look to the totality of the circumstances in evaluating this claim. *Biggers*, 409 U.S. at 196, 34 L. Ed. 2d at 409, 93 S. Ct. at 380; *People v. Simpson*, 172 Ill. 2d 117, 140, 665 N.E.2d 1228, 1240 (1996). If the defendant meets his burden, the State must then show, by clear and convincing evidence, an independent basis of reliability. *People v. Coleman*, 203 Ill. App. 3d 83, 91, 560 N.E.2d 991, 997 (1990), quoting *People v. Garcia*, 97 Ill. 2d 58, 73, 454 N.E.2d 274, 279 (1983). A trial court's ruling on a motion to suppress will not be set aside unless manifestly erroneous. *People v. Stewart*, 105 Ill. 2d 22, 41, 473 N.E.2d 840, 849 (1984).

Defendant argues that Andre Williams' lineup and in-court identification should have been suppressed because the police told him that the man he had previously identified in a photo array would be present. Most of the cases defendant relies upon are easily distinguishable. Defendant cites *Stovall v. Denno*, 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967), a case involving a "showup" identification that the court held was *not* suggestive. Defendant cites *Brooks*, in which an assistant State's Attorney told the witness several times, before showing him any pictures, that defendant was the one who shot him. *Brooks*, 187 Ill. 2d at 129, 718 N.E.2d at 109. Defendant cites *People v. Blumenshine*, 42 Ill. 2d 508, 510, 250 N.E.2d 152, 153, (1969), where witnesses were told by the police that suspects were in custody and they were shown only the accused alone and with his accomplice. In this case, there is no evidence that the police referred to defendant as a suspect and they did not limit either the photos or the lineup to suspects.

Defendant cites *Foster v. California*, 394 U.S. 440, 442-43, 22 L. Ed. 2d 402, 406-07, 89 S. Ct. 1127, 1128-29 (1969), which involved a lineup where the petitioner stood out from the other two men by

height and the fact that he was wearing a leather jacket similar to that worn by the robber. When this did not lead to positive identification, the police permitted a one-to-one "showup" confrontation between petitioner and the witness. Even after this, the witness's identification of petitioner was tentative; so days later, another lineup was arranged in which the accused was the only person who had also participated in the first lineup.

In this case, the record shows that after the shooting, Williams helped the police produce a computer-generated composite sketch of the offender. Williams also looked at a number of photo books. Two days later, Williams picked a photograph of defendant out of a photo array but said that he would want to see him in person to be 100% sure. Williams testified that he told the police at the time that this was the individual who was there. The trial court found that the array consisted of similar photographs. More than two months later the police asked Williams to view a lineup including the man whose photograph he selected. When Williams saw defendant in the lineup, he attempted to break the one-way mirror between them.

Thus, it appears that Williams' identification was far less tentative than in *Foster* and the procedure less suggestive, as defendant here was not shown to have "stuck out" by physical characteristics or dress. Indeed, Williams identified defendant from the photo array before the lineup was conducted. Defendant was present in both the photo array and lineup, but identification procedures are not invalidated simply because defendant is the only person whose photograph was previously shown to the person viewing the lineup. *People v. Hartzol*, 222 Ill. App. 3d 631, 643, 584 N.E.2d 291, 300 (1991); *People v. Thompson*, 93 Ill. App. 3d 995, 1007, 418 N.E.2d 112, 121 (1981) (subsequent lineup identification is not impermissibly suggestive because defendant was only person in lineup whose photograph had previously been shown to witness). Here, defendant asserts that he was the only person in both the photo array and lineup, but he does not support this assertion with a citation to the record on appeal.

Moreover, defendant here has not provided the composite or the photographs viewed by the trial judge at the suppression hearing. It is well established that it is not necessary to produce the photographs in order to prove or disprove suggestiveness. *E.g., People v. Brown*, 52 Ill. 2d 94, 285 N.E.2d 1 (1972); *Hartzol*, 222 Ill. App. 3d at 642, 584 N.E.2d at 300; *People v. Thompson*, 93 Ill. App. 3d at 1006, 418 N.E.2d at 121. However, the burden is on the appellant to demonstrate that the trial court's ruling was manifestly erroneous. In this case, this court is in no position to overturn the findings of the trial court with respect to the similarity of the photographs or others in the lineup with defendant absent these exhibits.

■ Thus, in this case, defendant's argument essentially asks this court to rule that a lineup is rendered unduly suggestive when the police tell the witness that a person the witness tentatively identified from a photo array will be present at the lineup. We agree with defendant that the police should not make such statements. Such statements certainly may be considered by courts in determining whether an identification procedure was unduly suggestive. However, the case law requires that courts examine the totality of the circumstances in making such determinations. Given the totality of circumstances presented in this case, the record does not show that the trial court's ruling was manifestly erroneous.

Furthermore, even if the procedure was deemed suggestive, the trial court also found that Williams' identification was consistently positive. In evaluating the reliability of an identification, Illinois has ascribed to the *Biggers* factors, which include: (1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification. *People v. Slim*, 127 Ill. 2d 302, 307-08, 537 N.E.2d 317 (1989), citing *Biggers*, 409 U.S. at 199-200, 34 L. Ed. 2d at 411, 93 S. Ct. at 382. In this case, Williams had ample opportunity to view defendant at the scene of the crime and had every reason to pay attention to him, as defendant and Foster had announced themselves as police. Williams' prior description of defendant was accurate. The trial court also had the opportunity to view the composite sketch Williams helped prepare for the police immediately after the shooting and the photograph Williams picked two days later. The trial court was also impressed with the certainty of Williams' violent identification at the lineup, as well as the strength of his testimony at the suppression hearing. Thus, defendant has failed to show reversible error on this point.

## II

■ Defendant next contends that he was prejudiced by his simultaneous but separate trial with codefendant Foster. The two-jury procedure is acceptable in Illinois " 'where a defendant is given every opportunity to present a complete defense before one jury, cannot point to any event which confused the jury or affected its ability to render a decision fairly, and the record shows that the trial judge adequately prepared the jurors for the procedure.' " *People v. Gholston*, 124 Ill. App. 3d 873, 888, 464 N.E.2d 1179, 1190 (1984), quoting *People v. Church*, 102 Ill. App. 3d 155, 164-65 (1981). The reviewing

court will not speculate as to the impropriety of the procedure but, rather, must be shown the prejudice that resulted from the dual jury trial. *People v. Brown*, 253 Ill. App. 3d 165, 178-79, 624 N.E.2d 1378, 1389 (1993).

■ Defendant particularly complains that the trial court erred in allowing his jury to remain in the courtroom while Foster's counsel cross-examined Patrice Billingsley and Detective Scott Rotkvich. However, defendant's brief contains no argument as to how those decisions prejudiced his right to a fair trial. Defendant notes generally that a defendant may be forced to defend against a codefendant's theory of the case when a jury hears such cross-examination, but he identifies no example of this occurring in his case. A review of the trial transcript, which the State also reproduced at pages 54-55 of the State's brief, shows that the brief cross-examinations heard by both juries related to Foster renting a truck, borrowing Billingsley's car and Detective Rotkvich witnessing a photo identification of Foster, none of which implicated defendant.

Accordingly, defendant has failed to show prejudicial error on this point.

### III

Defendant argues that his rights were violated by the admission of his statement to Ohio police, which he made without receiving *Miranda* warnings. The trial court refused to hold a suppression hearing on the ground that the motion was untimely. At common law, a claim that evidence was illegally obtained had to be raised before trial by means of a motion to suppress or to return the evidence, on the ground that the court should not be required to interrupt a trial in order to determine the collateral issue of the manner in which the evidence was obtained. *People v. Flatt*, 82 Ill. 2d 250, 262, 412 N.E.2d 509, 512 (1980). Our legislature, however, has relaxed the rule in certain cases. See *Flatt*, 82 Ill. 2d at 262, 412 N.E.2d at 512.

■ In this case, the applicable statute is section 114—11 of the Code of Criminal Procedure of 1963 (725 ILCS 5/114—11 (West 2002)), which states as follows:

"(a) Prior to the trial of any criminal case a defendant may move to suppress as evidence any confession given by him on the ground that it is not voluntary.

(b) The motion shall be in writing and state facts showing wherein the confession is involuntary.

(c) If the allegations of the motion state facts which, if true, show that the confession was not voluntarily made the court shall conduct a hearing into the merits of the motion.

\* \* \*

(g) The motion shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion."

This statute clearly sets forth that the appropriate time for filing motions to suppress is prior to trial, unless the circumstances of the case indicate that the section 114—11(g) exception should apply. This court has held that section 114—11 complies with the due process requirements, as it affords defendant a reasonable opportunity to challenge the admissibility of his or her statement. *People v. Placek*, 25 Ill. App. 3d 945, 951-52, 323 N.E.2d 410, 414 (1975); see also *People v. Johnson*, 38 Ill. 2d 399, 402-03, 231 N.E.2d 447, 449 (1967) (failure of appointed counsel to comply with a State procedural rule, such as section 114—12, governing motions to suppress illegally seized evidence, can constitute a binding waiver of the client's constitutional rights both under the federal and state constitutions). Accordingly, the trial court has the discretion to grant or deny a hearing on a motion to suppress made for the first time at trial, and the determination will not be disturbed on review absent an abuse of that discretion. *People v. Hoffman*, 84 Ill. 2d 480, 486, 419 N.E.2d 1145, 1147 (1981); *People v. Lamb*, 176 Ill. App. 3d 203, 207-08, 530 N.E.2d 511, 514 (1988).

■ In this case, defendant claims that the trial court gave no reason for its decision. However, a review of the trial transcript reveals that the trial court had before it a number of reasons to deny the defendant's motion. First, counsel did not only not make the motion before trial, but also did not so move until Officer Speaks had already given some testimony in the case. Second, the motion was not in writing, as required by statute. Third, when the prosecutor told the court during a sidebar on the issue that he had informed defense counsel he was going to use the statement, counsel replied, "I don't necessarily disagree with that." Fourth, while defense counsel claimed the failure to file a pretrial motion was an oversight, the trial court rejected counsel's claim, stating that counsel was experienced and that he would consider it to be tactical. Moreover, when the trial court characterized counsel's claim as a self-serving assertion of ineffective assistance of counsel, counsel replied that she was *not* claiming ineffectiveness. Furthermore, the prosecutor noted that counsel certainly knew of the State's intent after defendant's statement was mentioned in his opening statement.

Thus, the trial court did not abuse its discretion in denying the defense request for a midtrial suppression hearing.

## IV

■ Defendant contends he was denied a fair trial by the admission

of hearsay from Detective Karl, forensic biologist Ken Pfoser, and latent fingerprint examiner Deborah McGarry. The State correctly notes that defendant failed to raise an objection to the testimony of Detective Karl or forensic biologist Ken Pfoser in his posttrial motion. To preserve an issue for review, a defendant must both object at trial and specifically include the objection in a posttrial motion. *People v. Byron*, 164 Ill. 2d 279, 293, 647 N.E.2d 946, 953 (1995); *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129-30 (1988). Thus, the issue as to these two witnesses is waived. Defendant does not argue that the issue is one of plain error.

■ Defendant's remaining objection is to latent fingerprint examiner Deborah McGarry's testimony that her work is peer reviewed and verified by another researcher. In *People v. Smith*, 256 Ill. App. 3d 610, 615, 628 N.E.2d 1176, 1181 (1994), this court was faced with this exact question and held that such testimony was an out-of-court statement and it was offered to prove the truth of the matter asserted—that the fingerprint found at the scene of the crime was left by the defendant.

The State relies on cases such as *People v. Hickey*, 178 Ill. 2d 256, 279, 687 N.E.2d 910, 921 (1997), and its progeny to argue that laboratory protocol and the manner in which it was followed, the various quality control and quality assurance measures that the expert employed, go to the weight of the evidence, and not its admissibility. However, *Hickey* and its progeny address the issue of whether an expert's novel scientific opinion is admissible under the *Frye* standard and does not specifically address the issue of hearsay.

The State correctly notes that it is undisputed that even though reports made by others may be substantively inadmissible, an expert may use them in forming an opinion as long as experts in the field reasonably rely on such materials. *People v. Anderson*, 113 Ill. 2d 1, 7, 495 N.E.2d 485, 487 (1986). However, the State fails to point to any testimony or evidence of such reliance here. This is not surprising, as the peer review or verification necessarily takes place after the expert has already done his or her work. There are cases in which an expert relies on the prior records and reports of another expert, but the State has not shown that this case is one of them.

The State contends that the admission of hearsay identification testimony constitutes reversible error only where it is used as a substitute for courtroom identification or when introduced to strengthen and corroborate a weak identification. *Smith*, 256 Ill. App. 3d at 615-16, 628 N.E.2d at 1181. Such evidence is harmless error when it is merely cumulative or is supported by a positive identification and other corroborative circumstances. *People v. Mitchell*, 200 Ill.

App. 3d 969, 975, 558 N.E.2d 559, 564 (1990). In addition, the erroneous admission of hearsay evidence is harmless if there is no reasonable possibility that the verdict would have been different if the hearsay had been excluded. *People v. McCoy*, 238 Ill. App. 3d 240, 249, 606 N.E.2d 245, 251 (1992).

In this case, defendant was positively identified by Andre Williams, who observed the events, helped the police prepare a composite sketch of defendant, picked his photograph from an array and identified him in a lineup and in court. Defendant's general description and clothing were corroborated by the testimony of Patrick O'Brien and Robert Lilly. Sharon Hill testified that she saw defendant after the time of the offense, dressed similarly to the description given by the others (with the exception of not wearing a black jacket), wipe blood from his shirt with a towel. Hill also saw defendant pull bloody money out of his pocket, which was washed and split between defendant and codefendant Foster. Moreover, after excluding the hearsay, a jury on remand would still hear the opinions of forensic biologist Ken Pfoser regarding the victim's blood found in the car Foster borrowed, and of latent fingerprint examiner Deborah McGarry that defendant's fingerprint was found on a matchbook recovered at the scene of the crime. Given this record, the error in admitting the testimony regarding peer verification of the experts' results was harmless.

## V

■ Defendant claims that he was denied a fair trial because the trial court declined to give Illinois Pattern Jury Instructions, Criminal, No. 3.17 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.17), regarding the credibility of the testimony of an accomplice, to the jury. The State responds that the issue is waived. A defendant's general contention in the motion for new trial that the trial court erred in giving and refusing instructions is not sufficient to inform the court of its error. *E.g., People v. Pinkney*, 322 Ill. App. 3d 707, 715, 750 N.E.2d 673, 679 (2000). In this case, defendant's posttrial motion merely states that "[t]he Court erred in failing to give instructions requested by Mr. Prince." Thus, the issue is waived.

Where the evidence is closely balanced or the errors complained of are of such magnitude that they deprive defendant of a fair trial, the reviewing court will invoke plain error and review the alleged trial error. *Pinkney*, 322 Ill. App. 3d at 716, 750 N.E.2d at 680. In this case, however, defendant's plain error argument consists of a single sentence in his reply brief asking this court to employ the plain error rule because his error was preserved, neither arguing that the evidence in this case was closely balanced nor explaining why the magnitude of

the error denied him a fair trial, other than to state as a conclusion that the testimony at issue was prejudicial. Thus, we decline defendant's invitation to invoke the plain error doctrine. See *People v. Herron*, 215 Ill. 2d 167, 177-78, 830 N.E.2d 467, 474 (2005).

## VI

■ Defendant contends he was denied a fair trial by the admission of victim impact testimony from Shawanna Fields and Jewell Barker. Defendant's posttrial motion makes no reference to Jewell Barker and only a general objection to victim impact testimony by Shawanna Fields, resulting in waiver of the objection on appeal.

## VII

■ Finally, defendant argues that his 50-year sentence on the murder charge is excessive, given his age and lack of criminal background. The sentencing decision of a trial court is entitled to great deference. *People v. La Pointe*, 88 Ill. 2d 482, 431 N.E.2d 344 (1981). Absent an abuse of discretion by the trial court, a sentence may not be altered on review. *People v. Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882 (1977). This court will not substitute its judgment for that of the trial court merely because it would have decided differently (*People v. Cox*, 82 Ill. 2d 268, 412 N.E.2d 541 (1980)), especially where the sentence falls within the statutory range. *People v. Lambrechts*, 69 Ill. 2d 544, 372 N.E.2d 641 (1977).

In reviewing a claim that a sentence within statutory limits is excessive, the court must consider whether, given the particular facts of the case, the sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *People v. Fern*, 189 Ill. 2d 48, 55-56, 723 N.E.2d 207, 211 (1999). The trial court need not accord greater weight to defendant's potential for rehabilitation than to the seriousness of the crime. *People v. Wright*, 272 Ill. App. 3d 1033, 1046, 651 N.E.2d 758, 766 (1995).

In this case, the transcript shows that the trial court considered the aggravating and mitigating factors in addition to the information in defendant's presentencing report. Indeed, the transcript shows that the trial court found that defendant did not have a significant criminal background, at least in comparison to codefendant Foster. But defendant did have a pattern of escalating convictions, from possession of drugs to delivery of drugs to child endangerment with a weapon to unlawful use of a weapon. Defendant dropped out of high school, never had full- or part-time employment and had until recently been (or still was) a member of the Gangster Disciples. Testimony presented in aggravation suggested that defendant attempted to break into the home of his godmother, beat Stephanie Brown for refusing to give him

money to go to Columbus and tried to run down a police officer with his car. Given the record, the trial court did not abuse its discretion in imposing a sentence of 50 years in prison.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

QUINN, P.J., and GREIMAN, J., concur.