2024 IL App (1st) 232321-U

SIXTH DIVISION
July 12, 2024

No. 1-23-2321

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

---

| | | |
|---|---|---|
| IN THE INTEREST OF D.D., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | No. 18 JD 1187 |
| | ) | |
| v. | ) | |
| | ) | The Honorable |
| D.D., a Minor, | ) | Patricia Mendoza, |
| | ) | Judge Presiding. |
| Respondent-Appellant. | ) | |

JUSTICE TAILOR delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

## ORDER

¶ 1    *Held*:    The judgment is affirmed where the trial court properly exercised its discretion to admit the victim's statements to his mother under section 115-10 of the Code.

¶ 2                                I. BACKGROUND

¶ 3    On July 19, 2018, when D.D. was 14 years old, he was charged in a petition for adjudication of wardship with multiple counts of aggravated criminal sexual assault and aggravated criminal sexual abuse against two victims, C.H. and L.H.. The charges were based on an alleged incident that occurred on June 20, 2018, where D.D. forced C.H. and L.H. to put their mouths on his penis.

At the time, C.H., D.D.'s half-brother, was six years old, and L.H., D.D.'s step-cousin, was seven years old.

¶ 4     Before the adjudication hearing, the State filed a motion for a hearing pursuant to 725 ILCS 5/115-10(b)(1) (West 2018), informing the parties that it intended to introduce L.H.'s outcry statement to his mother, Crystal, as well as the statements that C.H. and L.H. made to Jacqueline Castillo, a forensic interviewer from the Chicago Child Advocacy Center (CAC).

¶ 5     At the section 115-10 hearing, Crystal testified. She said that in June 2018, she lived on the first floor of her grandmother Melody's house with her four kids, including L.H., and her grandmother. Crystal's mother, Donna, lived on the second floor of the home, in the attic apartment. At the time, Crystal's sister-in-law, Tasha, and Tasha's children, D.D. and C.H., visited the house regularly. There were no problems and "everybody got along fine." Then, on June 22, 2018, Crystal's daughter informed her that C.H. and L.H. told her that D.D. had "pulled out his dick," told them to put it in their mouths, and threatened to "punch the shit out of them" if they said anything. Crystal was "shocked" when she heard this. She then asked L.H. to tell her what happened. "[A]t first [L.H.] didn't say anything." Crystal told L.H. she was "going to pop him" if he didn't say anything, and then "popped him twice" on the shoulder before he told her that D.D. "pulled out his dick and told [him and C.H.] to put it in their mouth." In addition, L.H. told Crystal that D.D. told them they had to do it, that "[t]hey better not tell anybody," and that "if they said anything, that he was going to punch the shit out of them." Crystal did not ask L.H. anything other than "what happened" before he made these statements, and he was "crying and looking scared" when he told her what D.D. had done.

¶ 6     Crystal then went upstairs to speak with C.H.. Crystal's mother Donna was present, and Crystal told C.H. to "tell [his] grandma what happened." C.H. said that D.D. "pulled out his thing"

and "told [him and L.H.] to put it in their mouth." C.H. also said that D.D. said "he was going to hit they ass" if they did not do so. Crystal then "popped [D.D.] upside the head" which led her mother to call the police. When the police arrived, Crystal told them what C.H. and L.H. had disclosed to her. She later took L.H. to the CAC to be interviewed in connection with the incident.

¶ 7      Jacqueline Castillo, a forensic interviewer at the CAC, testified at the section 115-10 hearing as well. She explained that a forensic interview is a "neutral and developmentally appropriate method of gathering factual information involving any allegations of abuse or exposure to violence." After stating that she had conducted over 150 forensic interviews, the parties agreed that she was qualified as an expert in forensic interviewing. She interviewed L.H. on July 5, 2018, when he was 7 years old. The interview took place at the CAC and lasted approximately 50 minutes. During this interview, she was alone in a room with L.H.. Detective Michael Mega and DCFS worker Michelle Paulis were present in the observation room next door. Castillo asked L.H. "open-ended questions" and only used clarifying questions "when needed." She explained that she does not work for the Department of Children and Family Services or the police, and said her job is to work for the court, to "be neutral and gather the information that is being provided." A disk containing her recorded video interview with L.H. was admitted into evidence without objection.

¶ 8      Castillo started the interview by asking L.H. general questions about school, his family, and what he likes to do for fun. She told him it was okay to say "I don't know" or "I don't remember" and that the most important thing was to "only talk about the truth." She made sure he understood the difference between the truth and a lie, and then made him promise to only tell her the truth. Castillo asked L.H. why he came to talk to her, and if someone had done something to him. L.H. told her that his big cousin D.D. made him and his cousin, C.H., suck his "D". He

explained that D.D.'s "D" was his "dick," a private part that boys use to pee. L.H. said that after D.D. asked him to suck his "D" he said no, but D.D. said he would punch him and C.H. if they didn't do it, so they did. L.H. said that D.D. was lying on the floor, that D.D.'s shirt and shorts were on the bed, and that D.D. pulled his underwear down to his knees when he made L.H. suck his "D" with his mouth. L.H. said that D.D. made C.H. suck his "D" too. L.H. said D.D. told them to stop because their grandma was coming home. Afterwards, L.H. told his sister what happened, and she told their mom. L.H. said his mom got mad and asked him what happened. After L.H. told his mom what D.D. made him do, she ran upstairs and hit D.D..

¶ 9       Exhibit 2, containing Castillo's video-recorded interview with C.H., was also admitted into evidence at the hearing without objection. This video is not part of the record on appeal.

¶ 10     At the conclusion of the hearing, the State informed the court that it intended to call both C.H. and L.H. if the case proceeded to trial. The court reserved ruling on the State's motion and did not issue a decision for some time due to the COVID pandemic shutdown and a series of subsequent delays. On June 13, 2023, after reviewing the transcripts from the section 115-10 hearing as well as the videos of the forensic interviews with L.H. and C.H., the court found that "the time, content, and circumstances of the statements made to the witnesses contain sufficient safeguards of reliability and therefore should be admitted at trial pursuant to [725 ILCS 5/115-10]."

¶ 11     The case proceeded to an adjudication hearing on September 7, 2023. L.H. testified first. At the time of the hearing, he was 12 years old. He said that in June of 2018, when he was seven years old, he and his cousin C.H. went upstairs to lay down. D.D. came too and laid down on the floor with them. No one else was there except L.H.'s grandma, who was down the hall in her bedroom. L.H. testified that D.D. told him to do something when he was lying on the floor, but he

found it "difficult to talk about" what had happened. When the prosecutor asked L.H. if "anything bad happen[ed] upstairs" he said yes. L.H. testified that he touched a part of D.D.'s body, but he wouldn't say what body part because he "d[id]n't feel comfortable saying what happened." Upon further questioning, he admitted that he touched D.D.'s body part that D.D. uses "to pee" with both his hand and his mouth and confirmed that he didn't want to touch it. L.H. said he did not see anything happen with C.H.. L.H. said he told his mom, his sister, and a lady who asked him questions about what D.D. had done to him. L.H. said that when his mother asked him what happened he told her; he denied that she threatened him or hit him before he told her what happened. He testified that he did not remember if the police were called.

¶ 12 Crystal, L.H.'s mother, testified next. She said that on June 22, 2018, she had a conversation with her daughter and spoke with L.H. afterwards. When she asked L.H. what happened, he "looked at [her] startled, like he was shocked." When she asked him again what happened and he started crying, she told him he wasn't going to get in trouble, she just needed to know what happened. L.H. told her that D.D. "made him put his dick in his mouth" and said that "if he didn't he was going to punch [him and C.H.]." L.H. told her that both he and C.H. had to put D.D.'s dick in their mouth. Crystal admitted that she hit D.D. afterwards, and that the police came to the house because her mother had called them. Crystal said she took L.H. to a place where he could speak with someone about the incident a few weeks later. Although Crystal initially denied telling L.H. she was going to hit him and said she never struck L.H., she was impeached with her testimony from the section 115-10 hearing where she admitted threatening to "pop" L.H. and "popping him" before he told her what D.D. had done.

¶ 13 Jacqueline Castillo testified next. She explained that she had worked as a forensic interviewer with the CAC, and said her sole job was to gather factual information regarding any

allegations of abuse. The State then admitted Exhibit 1, the video recording of her interview with L.H., into evidence without objection and it was played in open court. The State then rested its case, and the defense presented no witnesses. During closing arguments, defense counsel argued that L.H. made up the allegations against D.D. because he did not want the police to arrest his mother for striking D.D.. The court reserved ruling and took the matter under advisement.

¶ 14    On October 20, 2023, the trial court issued its decision. It found that the State failed to meet its burden of proof as to the allegations regarding C.H. because "we only have the testimony of [L.H.] who on the stand testified that he did not observe anything happen between [C.H.] and [D.D.]," which contrasts with his testimony during the forensic interview where he claimed that something did happen." However, the court adjudicated D.D. delinquent based on the counts against L.H., and merged them all into a single count of aggravated criminal sexual assault. The court said it found L.H. "extremely credible." It acknowledged that L.H. was "hesitat[ing] at times in his testimony" and that he "appeared nervous and scared" but the court found this "understandable given the allegations." The court noted that L.H. "testified credibly and consistently with earlier statements made by him to the forensic interviewer and his mother." It noted that L.H.'s outcry to his mother happened "immediately after the event" and that his statements to the forensic interviewer took place "a mere week after the incident." It rejected defense counsel's suggestion that L.H. made up the story because his mother "threatened to and perhaps did hit him." It noted that L.H. "made the outcry to his sister, verified it to his mother, and then restated the events to the forensic interviewer."

¶ 15    At the disposition hearing, after hearing arguments from the parties, the court adjudicated D.D. a ward of the court, and placed him on probation until his 21st birthday. The court also

ordered D.D. to undergo sex offender training and treatment and advised him that he was required to register as a sex offender. He timely appealed.

¶ 16                                    II. ANALYSIS

¶ 17    D.D. raises a single issue on appeal. He argues that he was denied a fair trial when the trial court allowed the State to present L.H.'s out-of-court statement to L.H.'s mother, Crystal, under section 115-10 (725 ILCS 5/115-10 (West 2018)). He argues that this statement "lacked sufficient safeguards of reliability" because it was "directly induced by a threat of violence and being 'popped' in the head by Crystal, which amounted to undue adult influence and inducement rather than spontaneity." He contends that the admission of this statement was not harmless, because the court relied on it to support its delinquency finding.

¶ 18    The parties agree that we review a trial court's decision to admit statements under section 115-10 for an abuse of discretion. *People v. Applewhite*, 2016 IL App (4th) 140558, ¶ 57. "A trial court has a considerable amount of discretion in determining the admissibility of hearsay statements." *People v. West*, 158 Ill. 2d 155, 164 (1994). We will find an abuse of discretion only if "the trial court's determination [wa]s arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the stance adopted by the trial court." *Applewhite*, 2016 IL App (4th) 140558, ¶ 57.

¶ 19    Section 115-10 of the Code sets forth a "specific hearsay exception tailored to minors under 13 years old who have been victims of a sexual offense." *Applewhite*, 2016 IL App (4th) 140558, ¶ 65. It states,

> "[i]n a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13, *** the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by the victim of an out of court statement made by the victim that he or she complained of such act to another; and

(2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim."

725 ILCS 5/115-10(a)(1), (2) (West 2018).

¶ 20    "Section 115-10 was originally passed in response to the difficulty in convicting persons accused of sexually assaulting young children." *People v. Holloway*, 177 Ill. 2d 1, 9 (1997). In *Holloway*, our supreme court observed that "[i]t appears that the legislature, in providing for the admission of evidence of outcry statements as exceptions to the hearsay rule in certain cases, was concerned with *** the reluctance many victims have relating the details of the incident at trial." *Id.*

¶ 21    Under section 115-10, testimony "shall only be admitted" if the court find that "the time, content, and circumstances of the statement provide sufficient safeguards of reliability" and the child either testifies at the proceeding or is unavailable as a witness and there is corroborative evidence of the act. 725 ILCS 5/115-10(b)(1), (2)(A),(B) (West 2018). Because L.H. testified at trial, the only issue here is whether his statements to his mother were sufficiently reliable.

¶ 22    To make this reliability determination, a trial court must evaluate the totality of the circumstances surrounding the making of the out-of-court statements. *People v. Simpkins,* 297 Ill. App. 3d 668, 676 (1998); *People v. Soto,* 2022 IL App (1st) 201208, ¶ 121; *Idaho v. Wright,* 497 U.S. 805, 820 (1990). The court should also consider "the child's spontaneous and consistent repetition of the incident, the child's mental state, use of terminology unexpected of a child of similar age, and the lack of motive to fabricate." *People v. Burgund,* 2016 IL App (5th) 130119, ¶

8

247 (quoting *West,* 158 Ill. 2d at 164). It is the State that bears the burden of establishing that the out-of-court statement was reliable and not the result of adult prompting or manipulation. *People v. Zwart,* 151 Ill. 2d 37, 45 (1992); *People v. Garcia,* 2012 IL App (1st) 103590, ¶ 96.

¶ 23    After considering the totality of circumstances, we find that L.H.'s statements to his mother contain sufficient safeguards of reliability. First, L.H. made his outcry statement to his mother just two days after the incident occurred, and he gave a consistent statement to forensic interviewer Castillo less than two weeks later. His prompt outcry weighs in favor of a finding of reliability. See *People v. Guajardo,* 262 Ill. App. 3d 747, 760 (1994) (finding a few weeks' delay in reporting sexual abuse did not render the minor victim's statement unreliable, noting that the "failure of a young assault victim to make a prompt complaint is easily understandable because of the natural sense of shame, fear, revulsion, and embarrassment felt by children under such circumstances"); *People v. Sharp,* 391 Ill. App. 3d 947, 955-56 (2009) (finding a 33-day delay in reporting did not render a victim's statements inadmissible under section 115-10); Compare with *Zwart,* 151 Ill. 2d at 46 (finding the time and circumstances of the victim's statements did not "provide sufficient safeguards of reliability" when the victim did not make her first statement to her mother until approximately five weeks after the abuse occurred).

¶ 24    Second, L.H.'s statements about oral sex reflected a knowledge of sexual activity that is unusual for a seven-year-old child, further supporting the court's reliability finding. See, *e.g.*, *Guajardo,* 262 Ill. App. 3d at 760 (finding the content of the minor victim's statement to be reliable, reasoning that it was "unlikely that a seven-year-old boy in his circumstances would have such complete knowledge of oral sex, and it is highly doubtful that such a child could fabricate the details testified to").

¶ 25    Third, L.H. was consistent in his statements to his mother and Castillo, and in his testimony at trial, that D.D. forced him to put his mouth on D.D.'s penis. And L.H. told both Castillo and his mother that D.D. threatened to punch him if he refused to do so. See, *e.g*., *People v. Burgund,* 2016 IL App (5th) 130119, ¶¶ 249, 254 (the consistency of the victim's out-of-court statements "provide[d] sufficient guarantees of reliability to satisfy section 115-10"); compare with *Simpkins,* 297 Ill. App. 3d at 678 (finding a child's statements were not reliable enough to be admissible under section 115-10 because the child's statements were inconsistent, she recanted her allegations against the defendant before the section 115-10 hearing, and she told her mother that she lied about defendant sexually abusing her); *Zwart,* 151 Ill. 2d at 44-45 (finding the victim's statements were not sufficiently reliable where she  initially denied she was sexually abused and did not make her outcry statements until after substantial adult intervention).

¶ 26    Fourth, no evidence was submitted to indicate that L.H. had a motive to fabricate the allegations against D.D.. Compare with *Simpkins*, 297 Ill. App. 3d at 678 (finding the victim's statement unreliable where the victim told her mother she lied about defendant sexually abusing her "because she was mad at defendant for hitting her and her siblings").

¶ 27    Although Crystal testified at the section 115-10 hearing that she threatened to "pop" L.H. unless he told her what happened and that she "popped him twice" on the shoulder before his outcry, nothing in the record indicates that Crystal prompted or manipulated L.H. to say anything about D.D. or otherwise encouraged him to accuse D.D. of sexual abuse. Compare with *Zwart,* 151 Ill. 2d at 44-45 (finding the circumstances surrounding a victim's statements "particularly troubling" because the victim had been interviewed by at least three people regarding the  alleged abuse before she made statements implicating the defendant and no evidence regarding the substance of these prior interviews was admitted, making it "impossible for the trial court to

determine whether the victim was questioned in a suggestive manner or was encouraged to accuse the defendant of sexual abuse"). Crystal consistently testified that she asked L.H. what happened, nothing more. We do not find this open-ended question inherently coercive or suggestive. See *Garcia*, 2012 IL App (1st) 103590, ¶ 99 (finding a child's statements were "not the result of leading questions" when a child was simply asked "what was happening with her"); see also *Soto*, 2022 IL App (1st) 201208, ¶ 122 ("Because a child may understandably be reluctant to be candid about a traumatic experience, asking a child questions is not inherently coercive or suggestive.")

¶ 28    After considering the totality of the circumstances, including the timing, nature, and circumstances surrounding L.H.'s outcry statement to his mother, we find that the trial court did not abuse its discretion when it found L.H.'s statement sufficiently reliable.

¶ 29    Moreover, even if the trial court erred by admitting L.H.'s statement to his mother, we find any error was harmless, because the statement was merely "cumulative or duplicate[d] properly admitted evidence." *People v. Patterson,* 217 Ill. 2d 407, 428 (2005). See also *People v. Littleton,* 2014 IL App (1st) 121950, ¶ 65 (quoting *People v. Prince*, 362 Ill. App. 3d 762, 776 (2005)) ("The erroneous admission of hearsay evidence is harmless error 'when it is merely cumulative or is supported by a positive identification and other corroborative circumstances.' ") L.H. testified at trial and the court found him "extremely credible." Although he "hesitate[d] at times in his testimony," and "appeared nervous and scared," L.H. testified that he put his hand and his mouth on D.D.'s penis, and that he did not want to do so. His testimony, standing alone, was sufficient to support the court's decision. See *People v. Murray*, 194 Ill. App. 3d 653, 656 (1990) ("A conviction may rest upon the testimony of a single witness, if positive and credible[.]") His trial testimony was also consistent with his earlier videotaped statement to forensic interviewer Castillo, which was admitted into evidence without objection. Because L.H.'s trial testimony was

corroborated by his earlier statements to Castillo, any error relating to the admission of his outcry statement to his mother was harmless. See, *e.g., In re Brandon P.*, 2014 IL 116653, ¶ 92 (finding that the improper admission of the victim's statement under section 115-10 of the Code was harmless because the disputed statement was "merely cumulative" of properly admitted testimony); *In re Rolandis G.,* 232 Ill. 2d 13, 46 (2008) (finding that any error stemming from the erroneous admission of the victim's statement under section 115-10 of the Code was harmless where the statement was "largely repetitive" of properly admitted evidence, which overwhelmingly established the defendant's guilt).

¶ 30                                    III. CONCLUSION

¶ 31     For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 32     Affirmed.