2020 IL App (1st) 191673-U

SIXTH DIVISION
September 11, 2020

No. 1-19-1673

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 3231 |
| | ) | |
| CHRISTOPHER PEACOCK, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**O R D E R**

¶ 1     *Held*: Conviction for reckless homicide affirmed where it was not against the manifest weight of the evidence for the jury to reject defendant's theory that he was unconscious while driving; the circuit court did not err in failing to discharge the jury where potential jurors were questioned about their ability to put aside statements made by a member of the venire; and causation instruction was not given in error where the State was required to prove causation and instruction was not misleading.

¶ 2     Defendant Christopher Peacock was found guilty of reckless homicide and sentenced to four years and five months in prison. On appeal, Mr. Peacock argues (1) the evidence presented at

trial was insufficient to support a finding of guilt, (2) he was denied due process where the jury was not fair and impartial, and (3) the jury was improperly instructed on causation. For the following reasons we reject each of Mr. Peacock's arguments and affirm his conviction.

¶ 3                                    I. BACKGROUND

¶ 4     Mr. Peacock was arrested on September 3, 2015, after he crashed his blue 2005 Chevy Colorado pickup truck into a cement barrier, killing Jillian Tsirtsis who was in the passenger seat of the truck.

¶ 5     Mr. Peacock's trial commenced on April 30, 2019, with jury selection. The court instructed the venire on the principles "[t]hat the defendant is [] presumed innocent of the charges against him[,] that before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt[,] *** that the defendant is not required to offer any evidence on his own behalf[,] [and] the defendant's failure to testify cannot be held against him." The court questioned potential jurors individually during the morning and then dismissed the venire for a lunch break, requesting four potential jurors stay behind for questioning. The parties then selected 10 individuals from the group questioned during the morning to empanel.

¶ 6     When the venire returned from a break, the court was notified that a member of the jury pool, Jovica Jokanic, had discussed the case during the break against the court's instructions. The court questioned Mr. Jokanic outside the presence of the other members of the venire. Mr. Jokanic said that Brandon Smith, a member of the venire, talked to him about the case and that Mr. Smith had said, "I don't need to be here, like the guy is guilty, everybody knows, blah blah blah." The court asked Mr. Jokanic if hearing these comments made by Mr. Smith would prevent him from being fair and impartial, to which Mr. Jokanic responded, "no."

¶ 7     The court then questioned Mr. Smith outside the presence of the other members of the

2

venire. Mr. Smith admitted discussing the case with others, stating, "[w]ell, I was—yes, sir, because I thought we could talk amongst ourselves and not nobody else." When the court stated that it specifically instructed the jury otherwise prior to the break, Mr. Smith responded that he "must have passed out" and missed that instruction. He told the court that he said that Mr. Peacock is probably guilty. When asked how many people he said this to, he replied, "[m]inimum two" and identified Mr. Jokanic and another individual. He later said, however, that "it's a lot of people that heard me" and "everybody heard me that was part of [the] whole court." The court dismissed Mr. Smith from the jury pool.

¶ 8    The defense requested that Mr. Jokanic be dismissed for cause and also asked for a new venire but then said, "I mean I want to find out who this guy talked to." The court struck Mr. Jokanic from the jury pool and the parties agreed to question the venire to determine who had heard Mr. Smith discuss the case. The court asked if anyone heard Mr. Smith make statements about the case, and two potential jurors raised their hands. Those two jurors were not empaneled. The court then asked if "anybody ha[d] a difficulty putting this nonsensical statement out of their mind and reject[ing] what he said?" Mr. Gregorio Herrera, who was already selected to be empaneled, then raised his hand. The court stated: "it's very important that everybody keep an open mind until this case is over and you are in the jury room deliberating, that's the only time you're authorized to discuss the case and the evidence *** does anybody have a problem with that, raise your hand." No hands were raised. The court then sent the 10 selected jurors to the jury room, including Mr. Herrera, and continued with jury selection, specifically asking the remainder of the venire if  they had "any difficulty whatsoever to disregard all and anything Mr. Smith may have said." No juror raised their hand.

¶ 9    After jury selection, the defense moved to discharge the jury. In denying the motion, the

court noted the jurors who heard Mr. Smith's comments were not on the panel. Defense counsel pointed out that Mr. Herrera was on the panel and that he had raised his hand during questioning. The court asked if defense counsel would like the court to question Mr. Herrera individually, and defense counsel said no.

¶ 10     The trial proceeded that same day with opening arguments. Mr. Peacock's defense was that he had a seizure while driving his truck, which caused him to crash into the cement barrier that divided Lake Shore Drive from Kathy Osterman Beach, and thus his driving was not reckless conduct but was, instead, the involuntary result of his seizure.

¶ 11     The jury heard from 12 witnesses during trial including the victim's mother, 4 eyewitnesses, 2 responding emergency personnel, 4 Chicago Police Officers, and an expert in neurology.

¶ 12     Officer Bradley Hespe testified that northbound Lake Shore Drive is four lanes wide and ends at Hollywood Avenue with an "almost 90-degree" left turn. He testified that there are signs that alert drivers to the approaching curve and that each lane of traffic is marked with "a large white slow, slow, slow." Investigator Paul Niezabitowski testified that the speed limit drops from 40 miles per hour to 20 miles per hour when approaching the curve. Tara Sherman testified that, because there is a small incline in the road as you approach Hollywood Avenue, the curve in the road where Lake Shore Drive ends cannot be seen until the top of the incline.

¶ 13     Three witnesses saw Mr. Peacock's car prior to the crash: Ms. Sherman, Paige Donovan, and Sarah Mostad, all of whom were driving northbound on Lake Shore Drive at around 7:20 p.m. Ms. Sherman testified that a small pickup truck passed her driving "very fast" on the left. She described that "[i]t cut all the way over from the left to the far-right lane" somewhere around the Montrose Avenue, Wilson Avenue, and Foster Avenue exits. She estimated the truck was going

90 to 100 miles per hour. She stated that "it looked like [the truck] was going to exit and then right at the last second, like right at the divider, it jerked back into the right lane of traffic." She lost sight of the truck until she reached the end of Lake Shore Drive, where she "saw the vehicle turned over pretty far into the park on its roof." Ms. Sherman testified that she saw Ms. Tsirtsis's body "far from the street, past the bike path, and far from the car." On cross-examination, the following exchange occurred:

"[DEFENSE COUNSEL]: The car was out of control?

[MS. SHERMAN]: Not out of control.

[DEFENSE COUNSEL]: You used the word jerked. You said it looked like it was going to get off and then it jerked back?

[MS. SHERMAN]: Uh-huh

[DEFENSE COUNSEL]: So it wasn't a smooth movement?

[MS. SHERMAN]: It moved quick back into that right lane. It didn't, like, cross back into the next lane over or anything."

Ms. Sherman also testified that she never saw the truck use its turn signal.

¶ 14     Ms. Donovan testified that she saw a blue pickup truck speed past her on the left. She saw "dark brown hair flowing out the window" on the passenger side. At trial she estimated the car was going between 70 and 80 miles per hour. She did not see the truck change lanes and lost sight of the truck for a minute or two. When she approached the turn from Lake Shore Drive onto Hollywood Avenue, she saw "the car ha[d] already crashed and [she] saw the car laying on its front side and—well, laying upside down."

¶ 15     Ms. Mostad testified that "a blue pickup, small, older model flew by [her], just flew by [her], and was cutting in and out of traffic very, very quickly" at what she estimated was 90 miles

per hour. Expanding on her description, Ms. Mostad testified, "it was like Mario [K]art when someone is an extremely good player and it is hyper articulate like in out, in out, in out, like not—not like a swerving, like uncontrolled, but very hyper-controlled like *** someone who was good at this." Ms. Mostad testified that the car moved both left and right. She continued to watch the truck as it approached the curve and she "saw it hit the wall and knock a light pole and flip." She further stated that just prior to the crash the car was still cutting in and out of traffic quickly. She exited her car and saw "a person *** unconscious or most likely dead" on the ground.

¶ 16    Multiple responders came to the scene, including two paramedics, Alyna Castaneda and Michael Skocz, two Chicago police officers, Officer Hespe and Officer Joseph Elfayer, and Samuel Castro, a lifeguard at Kathy Osterman Beach. The following is taken from their testimony.

¶ 17    Mr. Peacock crashed his truck into the cement barrier. The truck then flipped multiple times in the air. During this time, Ms. Tsirtsis was ejected from the truck. Mr. Castro described her as "badly mangled, bones sticking out, blood coming out. She was face down." He testified she did not have a pulse and was not breathing. She was about 15 to 30 feet from the truck. Ms. Castaneda testified that Ms. Tsirtsis was dead when he arrived on the scene.

¶ 18    Mr. Castro testified that he went to the truck, found Mr. Peacock, asked him to move his fingers if he was conscious, and Mr. Peacock moved his fingers. Mr. Peacock was "pin[ned]-in" the truck and was eventually removed by the fire department. Once he was removed, the paramedics attempted to get him on a gurney to put him in an ambulance. Mr. Peacock was described as "combative and confused" and unable to follow directions or requests by Mr. Skocz. However, he did eventually "calm down and become more responsive[,] *** more alert and verbal and responding to questions more appropriately." Officer Hespe also described Mr. Peacock as combative, stating he was "fighting" the paramedics and "every time they would put his arms

somewhere, he would push it away, you know, deliberate[ly] trying to prevent them from doing what they were doing." On cross-examination, Officer Hespe was asked if Mr. Peacock's behavior was consistent with "being disoriented," to which Officer Hespe responded, "I don't particularly agree with that." Mr. Skocz was asked whether Mr. Peacock's behavior was similar to someone who had just had a seizure, and he stated, "[i]n my opinion, he was initially combative and aggressive towards us prior to calming down. So typically, typically, not all seizures are the same, but typically we see individuals after seizures to be drowsy, fatigued, and possess a low level of consciousness, have confusion."

¶ 19     Mr. Skocz conducted a trauma assessment on Mr. Peacock, which "[r]evealed some trauma to the face, particularly the right eye, bruising and trauma to the hips, and various other abrasions and scratches." Mr. Skocz confirmed injuries to the abdomen as well and testified that the injuries to the abdomen and hips were consistent with a seatbelt restraint.

¶ 20     Investigator Dan Postelnick, a Chicago police officer with the Major Accident Investigation Unit, testified that the damage to the car was consistent with the right front corner being the site of initial impact. Investigator Postelnick determined that the passenger-side seatbelt was not used. He also testified, based crash data retrieved from the truck, that the truck was traveling 96 miles per hour five seconds prior to impact, 93 miles per hour four seconds prior to impact, 94 miles per hour three seconds prior to impact, 96 miles per hour two seconds prior to impact, and 98 miles per hour one second prior to impact and that the break was not applied during or directly preceding the accident. Investigator Niezabitowski obtained video footage from a police observation device and identified Mr. Peacock in two videos, which were played for the jury. Those videos were not made part of the record on appeal.

¶ 21     The parties stipulated that Dr. Latanja Watkins, an assistant medical examiner for Cook

County at the time of the incident, would be qualified as an expert in pathology and forensic pathology and would testify that the cause of Ms. Tsirtsis's death was multiple injuries due to a motor vehicle collision and the manner of death was accident.

¶ 22    Mr. Peacock called as his only witness Dr. Steven Bayer, a licensed physician. Dr. Bayer was qualified as an expert in neurology. Dr. Bayer testified that he treated Mr. Peacock in 2013 after Mr. Peacock injured his head when he fell in a parking lot and sustained a subdermal hematoma. Mr. Peacock underwent a craniectomy and following his surgery was placed on, among other things, anticonvulsant medication. Dr. Bayer testified that Mr. Peacock was put on anticonvulsants as a preventative measure because of the severity of the trauma to his head and because he underwent a neurosurgical procedure.

¶ 23    Dr. Bayer explained that the only way to diagnose a seizure is to perform an EEG while the seizure is occurring. He described the behaviors that would manifest following a seizure as follows:

> "there are a variety of seizures. On one extreme, a person may have an absence attack and come out of it and keep doing exactly what they were doing. On the other extreme, certainly though if a person has a tonic-clonic a convulsion, often afterwards they will be lethargic or sleepy, they can be—their level of consciousness may not be normal for a while, they can often be confused because they have, you know, a generalized seizure robs you of any memory of what happened."

¶ 24    Defense counsel then asked if "based on your review of the medical records from 2015 at Illinois Masonic, do you have an opinion to a reasonable degree of medical certainty as to whether or not Christopher Peacock suffered a seizure on September 3, 2015, at approximately 7:20 p.m.?" Dr. Bayer responded "[w]ell, again, I don't think anyone can say with 100 percent certainty, you

can't. I think that as—from what I read, his behavior was, you know, was consistent with the behavior of someone who could have had a seizure. Absolutely."

¶ 25 On cross-examination, Dr. Bayer testified that nothing indicated that Mr. Peacock had ever had a seizure and no seizure had ever been reported. Dr. Bayer acknowledged that Mr. Peacock's post-accident behaviors could also be explained by a head injury sustained in the crash or shock. Dr. Bayer was asked if it was correct that there was nothing in Mr. Peacock's medical records that led him "to form an opinion to a reasonable and scientific or medical certainty" that Mr. Peacock had a seizure, and Mr. Bayer responded, "correct." When the State asked if a person having a seizure would "be able to drive their vehicle from right lane to left lane to left lane to right lane to right lane, in that fashion while driving 100 miles [per] hour?" Dr. Bayer responded, "[a] generalized seizure or even an absence seizure robs a person of the ability to perform."

¶ 26 During the jury instruction conference, Mr. Peacock objected to the State's proffered instruction on causation, arguing it was not a contested issue. The court overruled the objection because causation was an element of the crime and the jury was given the Illinois Pattern Jury Instructions, Criminal, No. 7.15 (approved April 26, 2019) (herein after IPI Criminal No. 7.15) on causation.

¶ 27 The jury returned a verdict of guilty on May 3, 2019. Mr. Peacock filed a motion for judgment of acquittal and a motion for new trial on May 31, 2019, arguing, *inter alia*, that the evidence did not support a finding of guilt beyond a reasonable doubt and that he did not receive a fair and impartial trial. Mr. Peacock did not renew his objection to the causation instruction in his posttrial motion. On June 6, 2019, the posttrial motion was denied and Mr. Peacock was sentenced to four years and five months in prison.

¶ 28                                    II. JURISDICTION

¶ 29     Mr. Peacock filed a motion to reconsider his sentence which was denied on June 24, 2019. He timely filed his notice of appeal on July 15, 2019. This court has jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments of conviction in criminal cases.

¶ 30                                      III. ANALYSIS

¶ 31     On appeal, Mr. Peacock argues that (1) the evidence at trial was insufficient to prove beyond a reasonable doubt that he consciously disregarded any risk while driving, (2) the court erred in failing to discharge the jury, and (3) the court erred in instructing the jury on causation. We address each of these in turn.

¶ 32                          A. Sufficiency of the Evidence

¶ 33     Mr. Peacock first argues that the State did not prove him guilty beyond a reasonable doubt where it failed "to provide any sufficient evidence that [he] acted consciously reckless." We disagree.

¶ 34     "The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). On appeal, the reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "The trier of fact is best equipped to judge the credibility of witnesses, and due

consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses." *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). Only in cases where the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of [a] defendant's guilt" should an appellate court reverse. *Id.* at 115.

¶ 35    The offense of reckless homicide is committed when a person causes the death of an individual by operation of a motor vehicle and "his acts *** which cause the death are such as are likely to cause death or great bodily harm to an individual, and he performs them recklessly." 720 ILCS 5/9-3(a) (West 2018). "A person *** acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow *** and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2018).

¶ 36    Mr. Peacock argues that the evidence "established that [he] did not consciously engage in reckless behavior." Mr. Peacock relies on the testimony from Dr. Bayer that he had previously been prescribed anticonvulsant medication as a preventative measure against seizures, testimony he was confused and combative following the accident, which was consistent with a seizure, and testimony he did not apply the breaks or turn the wheel immediately prior to impact. He also points to the lack of any evidence that he had a reason to consciously drive at 90 miles per hour or that he had any motive to act recklessly.

¶ 37    The jury, however, also heard evidence that Mr. Peacock was driving across lanes, in and out of traffic, and that this was not consistent with a seizure which robs an individual of the ability to perform. Dr. Bayer also testified that he could not "form an opinion to a reasonable and scientific or medical certainty" that Mr. Peacock had a seizure. While Mr. Peacock argues that Ms. Mostad's testimony concerning his controlled driving was not credible and conflicted with other testimony,

"[i]t is the role of the jury, not the appeals court, to assess the credibility of witnesses and resolve conflicts in the evidence" (*People v. Jackson*, 2018 IL App (5th) 150274, ¶ 52), and we cannot say that "the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt" (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)).

¶ 38    Based on the evidence presented at trial, the jury's determination in this case that Mr. Peacock was acting recklessly, rather than having a seizure, was not "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of [the] defendant's guilt." *Wheeler*, 226 Ill. 2d at 115. In short, we are required to respect the jury's verdict in this case because there was evidence presented to support it.

¶ 39    Mr. Peacock also argues that the State only proved that he was speeding and that speeding alone is not sufficient for a reckless homicide conviction. To support his argument, he cites *People v. Hawn*, 99 Ill. App. 3d 334 (1981), *People v. Frary*, 36 Ill. App. 3d 111 (1976), and *People v. Richardson*, 21 Ill. App. 3d 859 (1974). In those cases, this court found that the evidence of the defendants' speed did not support their convictions. However, we have also recognized that "a charge of reckless homicide may be justified by a combination of excessive speed and other circumstances which would indicate a conscious disregard, and the circumstances are such that a reasonable person would act differently under the same situation." *People v. Mikyska*, 179 Ill. App. 3d 795, 801 (1989). For example, this court has held that evidence that a defendant was speeding, weaving in and out of cars, and not using his turn signal was sufficient to support a conviction for reckless homicide. *People v. Testin*, 260 Ill. App. 3d 224, 229-30 (1994). Here, Mr. Peacock was driving at an extremely high rate of speed—70 miles over the 20-mile-per-hour speed limit at the curve—he ignored cautions to slow and signs alerting him of the impeding curve, he weaved through lanes of traffic, and he failed to use his turn signals. We find the evidence is sufficient to

12

support Mr. Peacock's conviction.

¶ 40                                    B. Fair and Impartial Jury

¶ 41    Mr. Peacock's second argument is that the trial court erred in denying his motion to dismiss the jury, which violated his right to fair trial before an impartial jury. Specifically, Mr. Peacock argues that the entire venire was contaminated when Mr. Smith made statements concerning Mr. Peacock's guilt before the jury was impaneled.

¶ 42    A criminal defendant has a right to a fair and impartial jury (*People v. Peeples*, 155 Ill. 2d 422, 458 (1993)), and "matters relating to jury selection and management are within the discretion of the trial court" (*People v. Nelson*, 235 Ill. 2d 386, 446 (2009)). "[T]he test for evaluating the court's exercise of discretion is whether the means used to test impartiality have created a reasonable assurance that prejudice would be discovered if present." *Peeples*, 155 Ill. 2d at 459.

¶ 43    Here, Mr. Smith, who was voicing his opinion about individuals charged with crimes, stated to members of the venire that Mr. Peacock was probably guilty. He was dismissed for cause, along with the individual he was speaking with. Because Mr. Smith indicated that most likely many or even all jurors also overheard him, the court questioned the entire venire as to who heard these comments.

¶ 44    In *People v. Del Vecchio*, 105 Ill. 2d 414, 430 (1985), our supreme court held that the trial court did not err in refusing to grant a mistrial or excuse veniremen who overheard a juror state, based on her prior knowledge of the case, that "the guy shouldn't be out walking the streets." The court reasoned that this was an isolated comment that would not cause the jurors to be "unable to reach a verdict based solely on the evidence" and stressed that "the court instructed the prospective jurors that [the] defendant was presumed innocent, that this presumption would be overcome only by proof of guilt beyond a reasonable doubt, and that they were to base their decision solely on the

13

evidence presented at trial." *Id*; see also *Peeples*, 155 Ill. 2d at 465-66 (the trial court's failure to excuse a juror for cause was not against the manifest weight of the evidence where the juror stated he could be fair).

¶ 45    In this case, Mr. Smith, with no prior knowledge of the case or Mr. Peacock, opined to others on the venire that Mr. Peacock was probably guilty simply because he was charged. The court had previously instructed the jury on the principles "[t]hat the defendant is [] presumed innocent of the charges against him[,] that before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt[,] *** that the defendant is not required to offer any evidence on his own behalf[,] [and] the defendant's failure to testify cannot be held against him." The comments from Mr. Smith were far less likely than those in *Del Vecchio* to influence prospective jurors and the trial judge repeatedly instructed the jurors to disregard these comments. Accordingly, the court took appropriate actions to protect Mr. Peacock's right to an impartial jury.

¶ 46    To the extent that Mr. Peacock is specifically arguing that Mr. Herrera should have been struck from the jury because he raised his hand when the court asked if anyone had an issue rejecting what Mr. Smith said, it was defense counsel's burden to move to strike him for cause and the trial judge had no duty to "*sua sponte* excuse a juror for cause in the absence of a defendant's challenge for cause or exercise of a peremptory challenge." *People v. Metcalfe*, 202 Ill. 2d 544, 555 (2002). The court instructed Mr. Herrera that Mr. Peacock was innocent until proven guilty, stressed the importance of keeping "an open mind until this case is over," and offered defense counsel the opportunity to question Mr. Herrera further, which defense counsel declined. Mr. Herrera's presence on the jury does not warrant a retrial where defense counsel failed to move to strike him from the panel and failed to avail himself of the court's offer to further question Mr.

Herrera.

¶ 47                                    C. Causation Instruction

¶ 48     Mr. Peacock's final argument is that the trial court erred in instructing the jury on causation. Because Mr. Peacock failed to raise this issue in his posttrial motion, the State argues that it is forfeited. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (a defendant is required to object both at trial and in a written posttrial motion to preserve an error for appeal). However, a reviewing court is permitted to consider an error that has been forfeited under the plain-error doctrine when either (1) "the evidence in th[e] case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence" or (2) "the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). Plain-error analysis starts with determining whether an error occurred at all. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). Under first-prong plain error, the defendant must also demonstrate that he was prejudiced by the error. *Herron*, 215 Ill. 2d at 187.

¶ 49     The purpose of jury instructions is to convey the appropriate principles of law applicable to the facts so that the jury can arrive at a correct conclusion based on the law and the evidence. *People v. Williams*, 181 Ill. 2d 297, 318 (1998). "There must be some evidence in the record to justify an instruction, and it is within the trial court's discretion to determine which issues are raised by the evidence and whether an instruction should be given." *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). Further, "[i]n a criminal case, fundamental fairness requires that the trial court fully and properly instruct the jury on the elements of the offense, the burden of proof, and the presumption of innocence." *People v. Pierce*, 226 Ill. 2d 470, 475 (2007). Jury instructions should not be misleading or confusing. *Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 50     IPI Criminal No. 7.15 states:

"In order for you to find that the acts of the defendant caused the death of Jillian Tsirtsis, the State must prove beyond a reasonable doubt that defendant's acts were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole and immediate cause of death."

¶ 51    The Special Supreme Court Committee on Jury Instructions recommends that "this instruction be given whenever causation is an issue under 720 ILCS 9-1(a)(1) (intentional murder), 720 ILCS 9-1(a)(2) (knowing murder), or 720 ILCS 5/9-3(a) (reckless homicide)." IPI Criminal No. 7.15, Committee Note.

¶ 52    Mr. Peacock argues that causation was not at issue at trial, that the only issue was whether he was purposefully driving recklessly or was having a seizure, and that therefore the instruction on causation was improper. He argues that the "overemphasis on causation likely led the jury into believing that as long as [Mr. Peacock's] speeding contributed to the deceased's death, he was guilty." The State responds that Mr. Peacock cannot make a claim of plain error because there was no error in giving this IPI instruction on an element of the crime, and even if there was error, there was no resulting prejudice. We agree with the State.

¶ 53    Mr. Peacock relies on *People v. Pinkney*, 322 Ill. App. 3d 707 (2000), where this court held that giving a nonpattern cause of death instruction that was substantially similar to IPI Criminal No. 7.15 was reversible error. *Id.* at 720. *Pinkney* is quite different than this case because there the causation instruction confused the jury and was used by the State to improperly undermine the defense that the defendant was not accountable for another individual's conduct.

¶ 54    The defendant in *Pinkney* was convicted of first degree murder after he and another individual both severely beat the victim, who was unarmed. *Id.* at 711-12. The State argued that,

even if the defendant had not caused the death of the victim, he was accountable for the actions of the other individual. The defendant argued that he only used nonfatal force and he should not be held accountable for the other individual's actions because he did not solicit, aid, or abet the other individual in the beating. *Id.* During closing argument, the State used the causation instruction to bolster the accountability theory. The State told the jury that it should hold the defendant accountable for the other individual's conduct because that individual was not a source "unconnected" to the defendant. *Id.* at 716. This was in contrast to the accountability instruction, which required the jury to find that that the defendant "knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense." On appeal, we held the accountability instruction and the causation instruction conflicted and that the State had improperly used the causation instruction to suggest to the jury that it could find the defendant accountable so long as he was not "unconnected" from the other individual.

¶ 55    Mr. Peacock argues that causation is implicit in the recklessness instruction and that there is a conflict between these two instructions. No such conflict is present in Mr. Peacock's case. Illinois Pattern Jury Instructions, Criminal, No. 5.01 (approved October 28, 2016), which was given in this case, states:

> "A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

The only phrase related to causation is "or that a result will follow." However, this phrase relates to the appreciation on the part of the actor that a specific result *will likely* come from an action, not that Ms. Tsirtsis's death was indeed caused by Mr. Peacock's actions. There was no conflict

17

between the causation instruction and the recklessness instruction. Moreover, the causation instruction did not address in any way, nor did the State ever suggest that it did, whether Mr. Peacock was acting voluntarily or was instead having a seizure. Thus, nothing about this instruction improperly undermined Mr. Peacock's defense.

¶ 56    Mr. Peacock points out that in *Pinkney*, we recognized that "the cases that are cited by the committee suggest that the instruction was created to be given where an intervening and alternative explanation for the cause of death is argued by the defense." *Pinkney*, 322 Ill. App. 3d at 718. Mr. Peacock correctly notes that he did not argue that Ms. Tsirtsis died from an intervening cause. However, neither the cases cited nor the committee notes suggest that the causation instruction should not be given if the defendant has not raised an issue on causation. The jury in this case heard evidence that Ms. Tsirtsis was not wearing her seatbelt and was ejected from the car, while Mr. Peacock, who was wearing his seatbelt, survived the crash. The State certainly had a burden of proving that Mr. Peacock's conduct cause Ms. Tsirtsis's death, notwithstanding that she was not wearing a seatbelt. Therefore, the trial court might have felt a causation instruction was necessary. We find no error in the trial court's decision to give this instruction. Moreover, even if the instruction was in error, Mr. Peacock is unable to point to any prejudice to him in the giving of this instruction.

¶ 57                                    IV. CONCLUSION

¶ 58    For the above reasons, we affirm the judgment of the trial court.

¶ 59    Affirmed.